No. 2,416.

A. HARPENDING, PETITIONER, *v.* H. H. HAIGHT, (Governor of the State of California), RESPONDENT.

39  189
132  268
39  189
149  520

MOTIVES OF THE LEGISLATURE NOT A PROPER SUBJECT OF INQUIRY.—The motives of a member of the Legislature in moving, or of the body of which he is a member, in passing a legislative Act, is not a proper subject of judicial inquiry.

CONSTITUTIONAL CONSTRUCTION.—VETO POWER.—ADJOURNMENT.—An adjournment of either house of the Legislature from day to day, is not such an adjournment as would prevent the Governor from returning a bill with his objections, within the ten days prescribed by the Constitution.

IDEM.—When a bill is returned with his objections, by the Governor, to the House in which it originated after it has adjourned for the day on the last of the ten days within which he can make the return, and because of failure to find the house in session, is re-delivered to and retained by the Governor, it does not constitute a return within the meaning of Section 17, Article IV of the Constitution.

IDEM.—The bill should be placed beyond the Executive control, by delivery to the President, Secretary, or other proper officer of the house.

MANDAMUS TO GOVERNOR.—Courts having jurisdiction of the writ of mandamus, may issue the same to compel the Governor to perform a ministerial act required by law and not included within the powers confided to his discretion by the Constitution.

*Per* TEMPLE, J., dissenting:

MANDAMUS.—The writ of mandamus should not issue when there is another sufficient and adequate remedy.

IDEM.—PETITIONER'S INTEREST.—Where the petitioner has no vested or specific interest in the proceedings, he is not entitled to the relief afforded by a writ of mandamus.

IDEM.—STIPULATION.—INQUIRY INTO FACTS.—A stipulation that the petitioner has such an interest in the proceedings as to make him a proper party thereto, does not preclude inquiry into the facts going to show the existence of such interest.

MANDAMUS.—JURISDICTION OF COURTS.—Courts have not jurisdiction to issue writs of mandamus to the Governor.

(T.)

APPLICATION to the Supreme Court in the exercise of original jurisdiction.

The case is stated in the opinion.

*S. Heydenfeldt*, for Petitioner.

*Wm. P. Daingerfield* and *Haymond & Stratton*, of Counsel.

*First*—The writ of mandamus is the proper and only method of compelling the respondent to authenticate the bill to the Secretary of State. That the Act is ministerial only, upon the facts agreed upon in the printed record. *Stuart* v. *Haight*, January Term, 1870 ; *McCauley* v. *Brooks*, 16 Cal. 11–57 ; *Marbury* v. *Madison*, 1 Cranch, U. S. R. 137; *Middleton* v. *Low*, 30 Cal. 596; *Tennessee, etc. R. R. Co.* v. *Moore*, 30 Ala. 371.)

*Second*—That it is to be presumed that the proceedings of the General Assembly, in suspending the rules, are constitutional, where the journals show nothing to the contrary. (*McCullough* v. *State of Indiana*, 11 Ind. 424 ; *People* v. *Hatch*, 33 Ill. 128.)

*Third*—That the motives of the Legislature in adjourning cannot be inquired into, and must be presumed to have been pure ; much less, then, could the motives of one man not a party to this proceeding, be inquired into. (Cooley on Constitutional Limitations, pp. 183, 186, 187, and cases cited ; *Fletcher* v. *Peck*, 6 Cranch U. S. Rep. 130, 131; *People* v. *Devlin*, 33 N. Y. 281.)

*Fourth*—That no evidence, other than the journals of the Legislature, can be admitted in this cause, and unless the journals of the Senate show a return of the bill within the constitutional time by the Governor, with his objections, the bill has become a law. (*Sherman* v. *Story*, 30 Cal. 266, and cases cited ; *People* v. *Devlin*, 33 N. Y. 269.)

*Fifth*—That in the computation of time, the day upon which the bill was deposited with the Governor, must be included in the count. Hence the bill became a law on the day before the Governor prepared his veto message. (Soldiers' Voting Bill, pp. 612 and 613 ; 45 New Hampshire

Rep. subdivision 4; also brief of petitioner in case of *Price* v. *Whitman*, 8 Cal. 412, and cases cited.)

*Sixth*—That the adjournment meant by the Constitution of this State (Article IV, Section 17), is an adjournment for the term by the *Legislature*, including both houses, and not by one house alone. (See Section 888, Story on the Constitution; also, 45 New Hampshire, 610, subdivision 2.)

*Seventh*—That after the adjournment of the Senate, March 31st, if the Governor wished to return the bill, he should have delivered it to the President of the Senate, Secretary, or some officer thereof, or deposited it in the office of one of these officers, so that the Senate could thus get control of the bill. (*Id.*)

*Eighth*—That the Legislature lost all control of the bill when it was sent to the Governor, and could not regain it by any act of either house. (*People* v. *Devlin*, 33 N. Y. 269.)

*Ninth*—That it is as much a constitutional right of the Legislature, under Article IV, Section 17, of the Constitution, to pass a bill *over the veto* of the Governor, as it was to pass it in the first instance; and in this case they were prevented from exercising such right.

*Tenth*—That the respondent having by his own acts deprived the Legislature of that right, the bill has become a law, and should be so declared.

*First*—In *Bolander* v. *Stevens* (23 Wend. 103), Senator Verplanck says: "But all our authorities are strong that as Judges are bound to take notice of a general law, so it is their province to determine whether it be a statute or not." (*Sherman* v. *Story*, 30 Cal. 263.)

A *fortiori*, this rule must hold in private acts. In pleading it is only necessary to refer to their title and date, and the Court must take judicial notice of them. (Hittell, Section 5001.)

*Second*—The case must be tried by the record alone; all else must be discarded. (*Sherman* v. *Story*.) The Court must know by this record that the bill in question passed both houses, and that it was not returned by the Governor to the Senate with his objections.

What is a return?  We will consider :  First—The object of the return; Second—The elements of a return.  The objects are to put the two houses in possession of the bill, in possession of the objections, that the house to which it is returned shall enter the objections and the bill upon its journal, and proceed to reconsider it, and to vote again upon its passage.

It follows, then, that the elements of a return are :

*First*—The objections of the Governor, to be put in writing.

*Second*—The transmission of bill and objections to the proper house.

*Third*—The delivery or putting into the possession of the proper house the bill and objections.

The return under consideration lacks this last and most vital element.  The Senate never got possession of either bill or objections, and had no opportunity to exercise its constitutional functions.  Nor can the adjournment of the Senate be pleaded as a reason to sustain the Executive power and to destroy and defeat the legislative power.

Nor was it necessary that the Senate should have been in session to enable a return of the bill and objections.  They might have been delivered to the President, or to the Secretary, or to the Porter, or laid upon the Senate desk, or nailed up against the door ; it is immaterial how, so that the Senate gets possession.  (See Soldiers' Voting Bill, 45 N. H. 607.)

The time of the attempted veto was too late in any event.

A word may be added upon the effect of the admission among the agreed facts, that the Senator who moved an adjournment on the day of the attempted veto, and the petitioner herein, were influenced by the motive of preventing a return of the bill.

In two cases in this State it is said to have been settled that the motives or inducements of legislators cannot be inquired into by a Court of law.  (*Fowler* v. *Peirce*, 2 Cal. 168 ; *People* v. *Bigler*, 5 Cal. 23.)

Much less would it be allowable to limit the inquiry upon an action of the Senate to the motive of one individual Senator, so as in any way to affect that action.

*Jo Hamilton*, Attorney General, for Respondent.

*First*—I take it as a proposition not to be successfully denied, that this Court has not jurisdiction of the *subject-matter* of this litigation; that no consent of parties, nor any stipulation submitted to them, can give them this jurisdiction.

So, also, if the remedy sought is beyond and outside of their jurisdiction, or if upon the facts stated they would be powerless to act in the premises.

It cannot and does not make the least difference in this principle that the respondent stipulates to be brought into this Court in the manner he was. No consent of parties can give jurisdiction, if the fact of jurisdiction over the *subject-matter* does not exist.

Jurisdiction of the person may be acquired by the consent of the person sought to be affected by the proceeding, when the Court has jurisdiction of the subject-matter; but this consent goes no further. Consent cannot clothe a Court with jurisdiction which it otherwise does not have. If this were not so, then jurisdiction of Courts would not be rejected by law, but by the option of the parties litigant.

The Court not having such jurisdiction as is claimed for it over the subject-matter, this writ must be refused. (*White-well* v. *Barbier*, 7 Cal. 63; *Gray* v. *Hawes*, 8 Cal. 568; *Wynns & Lawrence* v. *Underwood*, 1 Texas, 48; *Foster* v. *McAdams*, 9 Texas, 542; *Kent* v. *Kelso*, Dallam, 523; *Coffin* v. *Tracy*, 3 Cain, 129; *Dudley* v. *Mayhew*, 3 Coms. 9; *Clyde and Rose Plank Road* v. *Parker*, 22 Barber, 323; *Snyder* v. *Goodrich*, 2 E. D. Smith, 84; *Andrews* v. *Wheaton*, 23 Connecticut, 112; *Leigh* v. *Mason*, 1 S. 249; *Ginn* v. *Rogers*, 4 G. 131.)

*Second*—The right and power to mandamus the Governor does not exist in this Court (see statute concerning mandamus, which confines the process to *inferior persons*, 2 Hittell, page 777, Section 467), and will not lie against the Governor. (*People ex rel. Lowe* v. *Townes, Governor*, 8 Georgia, 360; *Hawkins* v. *Governor*, 1 Arkansas, 570; *People* v. *Hatch et al.*, 33 Ill. 9.)

Nor will mandamus ever be granted when the writ would be nugatory, upon the maxim *lex non cògit inutilia.* (*Public School Commissioners* v. *County Commissioners,* 20 Md. 449; *People* v. *Supervisors of Green,* 12 Barber, 217; *People* v. *Supervisors of Westchester,* 15 Barber, 607; *Col. Life Insurance Co.* v. *Supervisors of New York,* 24 Barber, 116.)

*Third*—The day the bill was presented to the Governor is not to be computed in the ten days given him for disposition. (*Price* v. *Whiteman,* 8 Cal. 412; Cushing's Law and Practice of Legislative Assemblys, pp. 920, 921, Secs. 2379–2380; *People* v. *Hatch et al.,* 33 Ill. 9.

While I admit a slight conflict of authorities on this point, the weight, not only of authority, but the reason of the rule, is that the time is computed *from and* after the day of *delivery.*

*Fourth*—The bill was vetoed within time. It was either returned on the tenth day, or if it was not so returned, then its return was prevented by the adjournment, and does not become a law.

His Excellency could not, as is contended by the petitioner, rightfully return the bill to the house after the tenth day, for it then became a law, notwithstanding his veto, because it was not returned within ten days.

He had no right to deliver it to any one within the ten days but the house from which it originated.

He had no right to return it after the ten days, for then it became a law, notwithstanding his veto.

He then did that which he was required to do: informed the Senate that by their action they had defeated the return of the bill, and that the same had not become a law.

*Fifth*—The Senate, by their act, as we contend, lost control of the bill, just as they might have done at any stage of legislation upon it by tabling, indefinite postponement, or any other action which would have resulted in its defeat.

WALLACE, J., delivered the opinion of the Court:

The petitioner moves for a peremptory writ of mandamus to be directed to the respondent, commanding him, as Governor of the State, to cause to be authenticated as a statute

a certain bill now in his possession, known as Senate Bill No. 258, which passed both houses at the late session of the Legislature.

The case comes before us upon a voluntary submission made by the parties upon the following agreed statement of facts:

Now comes the petitioner and respondent, and, without action, agree upon the following facts, and submit the same to this Court for adjudication:

I.—That petitioner has such an interest in the event of this proceeding as makes him a proper party thereto.

II.—That the respondent now is, and since the first Monday in December, 1867, has been, Governor of the State of California.

III.—That the Eighteenth Session of the Legislature of this State commenced on the first Monday in December, 1869, and ended on the 4th day of April, 1870; that there was no adjournment of the same after the 10th of March, 1870, and before said 4th day of April.

IV.—That on the 12th day of March, 1870, Senate Bill No. 258, entitled "An Act to make, open and establish a public street in the City and County of San Francisco, to be called Montgomery Street South, and to take private lands therefor," passed the Senate of the State of California, and, on the 17th day of March, 1870, passed the Assembly of said State, with amendments which were concurred in by said Senate on the same day.

V.—That on the 19th day of March, 1870, at 1 o'clock P. M. of that day, said bill was, by the Enrolling Committee of the Senate, delivered to the respondent for his consideration, as Governor.

VI.—That at the time said bill was delivered to the Governor it was properly enrolled and authenticated, as prescribed by law.

VII.—That on the 31st day of March, 1870, at 4 o'clock P. M., the Senate of said State adjourned, to meet at 11 A. M. next day.

VIII.—That on the 31st day of March, 1870, at 4:30 P. M., the private Secretary of the Governor entered the Senate Chamber with said bill, and, with a message in writing from the Governor, returned said bill to the Senate, without his approval; that, finding the Senate had adjourned, said Secretary returned said message and bill to the Governor, with whom they have ever since remained.

IX.—That said message had been signed by the Governor before 4 P. M. on said day.

X.—That on the 1st day of April, 1870, the Governor transmitted to said Senate the following message:

SPECIAL MESSAGE FROM THE GOVERNOR.

The following special message from the Governor was read:

STATE OF CALIFORNIA, EXECUTIVE DEPARTMENT, }
    Sacramento, April 1, 1870. }

*To the Senate of the State of California:* I deem it my duty to communicate to your honorable body the reason why messages returning two bills, whose titles are hereinafter given, failed of being yesterday delivered to the Senate. The bills referred to are substitutes for Senate Bill No. 293— an Act authorizing the parties therein named, their associates and assigns, to construct and maintain a ship canal from the City of Stockton to deep water, on the San Joaquin River; and Senate Bill No. 258—an Act to make, open, and establish a public street in the City and County of San Francisco, to be called Montgomery Street South, and to take private lands therefor. Messages, stating the reasons for withholding approval of these bills, were prepared and signed before the adjournment of the Senate, and were transmitted through the usual channel to the Senate Chamber before the customary hour of adjournment. The Senate having, by an adjournment until the next day, prevented the delivery of the messages and the return of the bills, they have failed to become laws, and will not, therefore, be deposited in the Secretary of State's office to be certified, as required in the case of bills which become laws by lapse of time, without return to the house in which they originated. I have thought it proper to communicate the facts in the case to your honorable body, and to ask respectfully that the messages be spread upon the journals of the Senate.

H. H. HAIGHT, Governor.

XI.—That petitioner has demanded of respondent that he authenticate said bill in manner and form as provided by law in cases where bills become laws by *not* being returned to the house in which they originated, within the time prescribed by law, and that the Governor has refused, and still refuses, so to do, but still retains said bill without authentication.

XII.—That the standing rule of the Senate, on said thirty-first day of March, required the Senate to assemble in the evening for business, unless otherwise ordered; that such evening session was usual and customary at the time, it being but four days before the final adjournment; that upon said day the Senate adjourned at said hour of 4 P. M. until the next morning, and that the motive of the mover of said adjournment was to prevent the return of said Senate Bill No. 293, and that said motion was made at the instance of petitioner.

The facts agreed and stated in subdivisions 8, 9, 10 and 12, are agreed to, subject to the ruling of this Court as to whether evidence to prove such facts would be admissible on the trial of any action involving the question whether said bill had become a law.

Upon this statement it is agreed that if the Court are of the opinion that said bill did become a law, a peremptory mandate may issue commanding the respondent to cause said bill to be authenticated as provided for by Section 2 of an Act entitled "An Act for the authentication of statutes without the approval of the Governor," approved May 1, 1852.

H. H. HAIGHT, Respondent.
HAYMOND, for Petitioner.

Creed Haymond, being sworn, deposes and says, that he is of counsel for petitioner in this proceeding, and that the controversy is real, and that this proceeding is in good faith, to determine the rights of the parties.

CREED HAYMOND.

Subscribed and sworn to before me this sixth day of April, 1870.

GEO. SECKEL, Clerk Supreme Court.

It will be seen that the solution of the questions presented requires at our hands, in some degree,.an examination into the respective rights and duties of the Executive and Legislative Departments of the Government, in the exercise by the latter of the law-making power of the State.

. It is of the deepest public concern, and of moment far beyond the mere decision of the particular case at bar, that the rights of each should be absolutely preserved from the possible assault of the other, and that neither, under cover of the performance of its own functions, should be permitted to deprive the other of its just measure of authority, as conferred upon it by the Constitution.

The clauses of that instrument—through which, as we think, a decision of this controversy is to be reached—are contained in Article IV of the Constitution, and are in the . following language :

"SECTION 1.   The legislative power of this State shall be vested in a Senate and Assembly, which shall be designated as the Legislature of the State of California.   *   *   *   *

"SEC. 17.   Every bill which may have passed the Legislature shall, before it becomes a law, be presented to the Governor.   If he approve it he shall sign it; but if not he shall return it, with his objections, to the house in which it originated, which shall enter the same upon the journal and proceed to reconsider it.   If, after such reconsideration, it again pass both Houses by yeas and nays, by a majority of two thirds of the members of each House present, it shall become a law, notwithstanding the Governor's objections. If any bill shall not be returned within ten days after it shall have been presented to him (Sundays excepted), the same shall be a law, in like manner as if he had signed it, unless the Legislature, by adjournment, prevent such return."

The bill in question was presented to the Governor, on Saturday, March 19th ; and if he intended to return it with his objections, he was, by the general language of the Constitution, bound to do so within a prescribed time after its presentation to him.

We shall proceed, therefore, to inquire whether or not the Governor did make the required return of the bill to the Senate, in which it had originated.   There can be no doubt

whatever of the meaning of the word "return," as used in this connection in the Constitution. As applicable to the bill itself, it is equivalent to the word "presented," as previously used in the same sentence. The bill must, before it becomes a law, be "presented to the Governor." It might be merely exhibited to that officer; and even if it should be immediately thereafter taken away or withdrawn, it might be contended that it had, nevertheless, been "presented" within the very letter of the Constitution. But when we come to reflect that the only purpose for which the bill is to be "presented to the Governor" is to afford him an opportunity to deliberately consider its provisions and prepare his objections, if any he have, to its passage, we would instinctively reject such a presentation as being fictitious—merely spurious—and certainly not that one contemplated by the Constitution, because it would defeat, rather than promote, the very object intended.

And so, upon the other hand, when we come to consider the corresponding duty of the Executive to "*return*" the bill to the Senate in this case, we know by attending to the results to be brought about by such "return" that it must be a step taken by which his own time for deliberation is ended, and that for the deliberation of the Senate is begun; that the bill itself must be put beyond the Executive possession; that it must be placed into the possession, actual or potential, of the Senate itself; and that, as part of this return, the Executive objections to the passage of the bill must be stated. For, unless these things be effected by the return, how can the Senate enter the bill and Executive objections upon its journal, or in what way proceed to the consideration of the objections themselves? Yet, the Constitution enjoins upon the Senate the performance of these several acts upon the return of the bill and objections to it. We think it clear that the presentation of a bill to the Governor made by the Legislature, under such circumstances as that he is prevented from considering its provisions, and a return of a bill made to the house in which it originated by the Executive—but so made that the house-can neither reconsider the bill nor examine the objections to its passage—

do not in either case constitute the presentation or return required by the Constitution.

And it is apparent to us that in the case at bar no return was ever so made, as that either the bill or objections came to the possession or knowledge of the Senate.

The facts upon this point are few. The Senate had been in session on the 31st of March, and at 4 o'clock P. M. had adjourned until the following morning, at 11 o'clock. Within a half an hour after the adjournment for the day, the Messenger of the Executive entered the vacant Senate chamber. The object of his appearance there was to impart to the Senate the knowledge of the fact that the Governor had vetoed the bill in question. He had with him the usual and appropriate evidence of the fact, for he bore in his hands the bill itself to be returned, as well as the message of the Governor addressed to the Senate, informing that body, in the usual phrase, that the bill was therewith returned without the Executive approval, and setting forth the reasons of his action in that respect. But the Messenger did not deliver to the Senate, nor deposit for its use with any officer of the Senate, or with any other person, either the bill or message; but immediately returned them both to the Governor himself, by whom they have ever since been retained. As a matter of fact, then, the Senate, upon the withdrawal of the Messenger from its chamber, was left in the same profound ignorance of the Executive action in the premises as it had been at the moment of his appearance there. There was, therefore, no opportunity afforded for the taking of those steps by the Senate, which the Constitution enjoins upon it, in case of an Executive return of a bill. And this circumstance is, as we have said, conclusive, in our opinion, that such a return cannot be considered to have been that one which is required by the Constitution to be made. It sets that instrument at substantial defiance in the very act of pretended obedience to its mandates. And if such practice be inaugurated, might not the Legislature easily retaliate upon the Executive Department? Would it be a difficult matter for it to send a Messenger or member of the Enrolling Committee of one of the houses to the Executive chamber

with a bill for the Executive consideration, who might not be able to find the Governor at the moment that he sought him? Would it not be easy to suggest, in connection with the fact of his absence, that he was purposely avoiding the Messenger? That such was his motive in absenting himself? And, then, if the Legislature should claim that they had been thus prevented from actually presenting the bill to the Governor, and that it had, therefore, become a law, would there not be found in the Constitution just as much to warrant such a claim as is to be found there in support of the constructive return made by the Governor to the Senate in this case?

It is not difficult to foresee the result to which such a doctrine would lead in times of high party strife, or when a decided and irreconcilable difference of opinion between the Executive and the Legislature upon important measures had been developed. Indeed, if these proceedings had on the part of the Governor and his Messenger amount to a veto of the bill at all, it was, of necessity, under the circumstances, an *absolute* veto; for it was one from the consequences of which the Senate had no means at its command to relieve the bill. Even though every Senator might in fact have been in favor of the passage of the bill over the Executive veto, there was no power, because there was no *opportunity* to do so. It is scarcely necessary to remark that an absolute Executive veto, based upon the return of a bill, is unknown to any constitutional system of government, State or Federal, under which we live, and that such a veto can, under no circumstances, be upheld, without doing violence to both the letter and spirit of the Constitution.

But the agreed statement informs us that the motive of the mover of the resolution to adjourn the Senate, was thereby to prevent the Executive from returning the bill.

We mention this portion of the agreed case, in order that it may not be supposed to have escaped our attention. It is proper, too, to add, that while this statement is contained in the record as a fact for our consideration in a mere legal point of view, it was admitted, in the oral argument had

before us, that it has since been discovered that it is wholly untrue in point of fact, and that no such motive did actuate the mover of the resolution to adjourn. We state this as a matter of justice to the Senator who made the motion in the Senate to adjourn on the afternoon of March 31st, upon whose public character the fact thus stated might, if not corrected in this manner, operate as a most unjust aspersion.

. This fact was stipulated, however, not absolutely, but subject to the opinion of the Court, as to whether evidence to prove such fact would be admissible on the trial of any action involving the question whether this bill had become a law.

Certainly no such evidence could be admitted on such a trial. It will be observed that the question does not extend to the motives of the majority of the Senate, by whose votes the motion to adjourn was adopted. There is no pretense that the motives of that majority were not free from the designs imputed to the Senator who introduced the resolution. And it would be unheard of, that the action of that majority should be called in question because of the mere personal motive of the particular Senator who moved the resolution. But even had the stipulation involved the motives of the entire Senate, in passing the resolution to adjourn on the occasion referred to, no inquiry on that subject could be permitted in the trial of an action of this character. It has been so settled in this State by the cases of *Fowler* v. *Peirce* (2 Cal. 168); *People* v. *Bigler* (5 *Id.* 23); *Sherman* v. *Story* (30 *Id.* 266), and by numerous foreign adjudicated cases and the opinions of text writers. We know of no authority which holds a contrary doctrine.

But, supposing that the law allowed proof to be introduced upon that point, and it should be conclusively established that the motive which actuated the entire Senate in adjourning to the next day, upon the occasion referred to, was to prevent the Executive from returning the bill on the 31st day of March, supposed to be the last of the ten days allowed him for such return, such proceeding, however, in itself disgraceful and unworthy of the Senate, would not . even tend to the supposed result. We think that there can

be no doubt that when the Executive Messenger arrived at the Senate chamber, and found that the Senate had adjourned for the day, he might have delivered the bill and message into the hands of the Lieutenant Governor, President of the Senate, the Secretary, or other officer of the Senate, or to one of the Senators, or to any proper person connected with or engaged in the service of the Senate, to be called to its attention as soon as an opportunity might thereafter offer; and that such a delivery would have been sufficient in law, as though it had been delivered to the presiding officer or Secretary of the Senate, in open session.

It was the duty of the Messenger to communicate to the Senate the message which he bore from the Executive on that occasion. This was to be done in the most direct manner that circumstances would permit. It was impossible for him to immediately announce it to the Senate, for that body was not in session. It had a right to be in recess, if it desired so to be, and it was not in the power of the Executive or his Messenger to recall it to its sittings. But its right to be in recess was no greater or higher than was the right of the Executive to return the bill in question for its reconsideration; nor is there any reason why the free exercise of these admitted rights upon the part of the Senate and Governor, respectively, should bring them into collision. The Senate has the unqualified, constitutional power to adjourn for three consecutive days. (Art. IV, Sec. 15, Constitution.) It must often happen that these three days will include the last day allowed the Executive for the exercise of the veto power against the passage of a particular Senate bill.

Now, if the mere fact of the recess of the Senate, thus constitutionally taken, does operate to defeat, in a measure, the exercise of the veto power conferred on the Executive by the Constitution, then we have the strange spectacle of an irreconcilable conflict between the several clauses of that instrument itself, by which the Senate, by the mere exercise of its own admitted constitutional authority to adjourn, violates the equally clear constitutional right of the Executive to have it kept in session.

We are of opinion that the adjournment of the Senate on

March 31st did not curtail the veto power of the Executive over the bill in question, nor should it eve have embarrassed him in its exercise. The return ꞏd have been made in such manner as the circumsto- ꞏꞏld permit; it should, at all events, have left the bili ꞏessage beyond the Executive control, and, if need bꞏ the immediate custody of some proper person who would ꞏ likely to deliver it to the Senate at the first opportunity. The best return that the circumstances would admit, would, in our judgment, be a proper return. The maxim *lex non cogit ad impossibilia* would be applicable to such a condition of affairs. We know of no other rule, either, upon which the clear right of the Governor to make the return to the Senate can be reconciled with the equally clear right of the Senate to be in recess at the time.

In the year 1864 a question of a similar character to this came before the Supreme Court of the State of New Hampshire. The Constitution of that State is substantially the same as ours in the particulars involved, except that it limits the Executive to five days in which to return a bill, instead of ten days, as in ours. The bill in question in that case, originating in the House of Representatives of the State of New Hampshire, had been presented to the Governor on Wednesday, August 17th. The 21st of August falling upon Sunday, it resulted that the Governor had the whole of Monday, August 22d, upon which to return the bill. But the House of Representatives was not in session on that day, because on the preceding Saturday, August 20th, both houses adjourned to Tuesday, August 23d. The Court say upon this point that it would, in their opinion, be sufficient for the Governor to return the bill to the Speaker, if within the five days; and they add, that "the house could not prevent the return of a bill by adjourning over any one of the five days, even though it should be the last one of the five, because the bill might, in that case, be returned within the time limited to the Speaker, or to the Clerk, or some other proper officer." (45 N. H. 610.)

Having reached the conclusion that the facts do not show that the Governor returned the bill to the Senate within the

meaning of the Constitution, we proceed to inquire whether "the *Legislature, by adjournment,*" prevented such return; for if it did, the bill could not become a law by reason of the failure of the Governor to return it within the ten days. We judicially know, and if we did not, we are distinctly informed by the agreed statement of facts, that the late session commenced on Monday, the 6th day of December, 1869, and terminated on the 4th day of April, 1870. The adjournment of the 4th day of April was, in our opinion, the only adjournment which could have prevented the Executive from making the required return within the prescribed time.

This results necessarily from the views we have expressed on the other proposition, in which we hold that the Executive may return a bill to the Senate, though it be not, at the moment of the return, in actual session. If it has adjourned for the day, or for three days, it still has an organized existence as a legislative body, with its President, Secretary and other officers, to whom, under such circumstances, a substitutional delivery of the bill and message might be made, and whose official duty it would be to place the bill and message before the Senate at as early a time as might be thereafter. Such a return, as we have said, would be the only one permitted by the circumstances, and when the bill should afterwards actually reach the Senate, it could then proceed to reconsider it, as required by the Constitution in that respect.

But when a final adjournment of the Legislature has occurred, there is an end to the organized existence of the Senate. It has no longer officers to represent it for any purpose; nor could the bill, in the nature of things, ever be brought to its attention, for it would not be in session thereafter, nor be reconsidered by it, which is the purpose to be attained, for it would be itself no longer existing.

In the New Hampshire case *(supra)* the Court say that "upon this point there can be no doubt. The adjournment referred to in the provision of the Constitution is not, we think, the ordinary recess or adjournment from time to time during the continuance of the session, but the final adjournment at the close of the session. In fact, this is the only

adjournment, we think, which can prevent a return of a bill within the time limited."

The seventeenth section of the Constitution of California, relating to the adjournment of the Legislature, which will prevent the return of a bill by the Governor, will be found to be substantially the same as the seventh section of the first article of the Federal Constitution, which regulates the exercise of the veto power of the President over bills passing the Senate and House of Representatives of the United States. Its language upon this point is as follows : "If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Congress, by their adjournment, prevent its return; in which case it shall not be a law."

It seems to have been the opinion of the late Mr. Justice Story (Com. on the Constitution, Section 891), that the only adjournment which could prevent the Federal Executive from returning a bill within the time prescribed, must be an adjournment amounting to "a termination of the session." In the New Hampshire case, as has been seen, the *Legislature did adjourn;* but the Court held that a mere temporary adjournment, even of both houses, did not prevent a return of the bill then in question. In the case before us, however, it does not appear that the Legislature—both houses— adjourned even temporarily. We do not think that the temporary adjournment of the Senate alone from 4 o'clock P. M. of one day to the usual hour of meeting on the morning of the next day, drew after it the grave constitutional consequence — attributable, in our opinion,· to no other adjournment than the final adjournment of the Legislature itself at the end of the session—of preventing the return of a bill by the Executive with his objections to its passage.

For the reasons given, and many others that readily suggest themselves, we think that the adjournment of the Senate on the thirty-first day of March was not an adjournment by which the return of the bill was prevented.

The Senate bill in question, therefore, became a law, and within the contemplation of the Act of May 1, 1852, the

second section of which is as follows : "Section 2. Every bill which has passed both houses of the Legislature, and shall not be returned by the Governor within ten days, having thereby become a law, shall be authenticated by the Governor causing the fact to be certified thereon by the Secretary of State in the following form : 'This bill having remained with the Governor ten days (Sundays excepted), and the Senate and Assembly being in session, it has become a law, this —— day of ——, A. D. ——'; which certificate shall be signed by the Secretary of State and deposited with the laws in his office." And this bill should receive the prescribed authentication and be deposited with the other laws of the State.

But the Governor refused to permit either the authentication or deposit, and retains the bill in his possession in the condition in which he received it from the Enrolling Committee of the Senate.

And here we reach the only remaining question for our consideration in the case.

Can the performance of this duty be enforced through the instrumentality of the writ of mandamus?

In the voluntary submission which was made of the cause, no such question was presented for determination. By the stipulation, as we have seen, it was agreed that if the Court are of the opinion that said bill did become a law, a peremptory mandamus may issue commanding the respondent to cause said bill to be authenticated, as provided by Section 2 of the Act of May 1, 1852, already cited.

Since then, however, the respondent has filed an exception to the jurisdiction of the Court, because "the functions of the Executive, in conjunction with the Legislature as part of the law-making power, are not the subject of mandamus."

[We shall consider this objection in the form here stated, without, however, being understood as conceding that any Executive function is "part of the law-making power."]

The Attorney General, too, in an able argument, brought to our attention since the submission of the cause, states the proposition in a more imposing form, and inquires : "Can it be successfully contended that the chief Executive of a State

—a correlative branch of the State government, equal in dignity with the Court—can be commanded to do an act, which, in his Executive opinion, may not be right?"

Undoubtedly, if the mere authentication of the bill, pursuant to the requirement of the statute, be a political power —such as the authority to grant reprieves and pardons, to convene the Legislature in extraordinary session, to appoint to office, to accord or withhold the Executive approval to legislative bills, or the like; or if there be any mere discretion in the Governor to withhold such authentication, when the statutory facts have occurred—it does not belong to the Judicial Department to interfere with its exercise in any manner. The Executive responsibility for the proper discharge of such trusts is directly to the immediate political representatives of the people, and ultimately to the people themselves.

But, we think it would be difficult to show that the case at bar is one of that character. The functions of both the Legislature in making the law, and of the Executive in the exercise of the qualified veto power conferred upon him, must have been completely exhausted before the duty of authentication and deposit in the Secretary of State's office can be asserted to have begun.

It is only because the bill has already become a law that the statute requires its authentication at all. It will be seen that the power and the duty to direct the authentication are inseparable, and that where the one exists there is no discretion to decline the performance of the other. The power to withhold the possession of a bill, which has passed both houses of the Legislature in the proper form of legislative proceeding, and has thereby become a law under the operation of the Constitution, either with or without the Executive signature, is one which is unknown to our people, and has no place in the system of government prevailing here.

It is true that, in the earlier days of Parliament, the Sovereign is said to have exercised the power of altering and amending bills at pleasure, before according the royal approval, but at that time the asserted authority of the Crown was almost absolute, and certainly under but little

restraint at the hands of the representatives of the Commons, the habitual language of whose addresses to the throne was: "Your poor Commons beg and pray, for God's sake, and as an act of charity," etc.   And it is also true that, at a much later period, the English princes of the house of Stuart, especially the Duke of York, when upon the throne, asserted, as part of the royal prerogative, the power to dispense with the operation of the statutes of the realm in such special cases, and in regard to such particular individuals, as they saw fit.   But even that claim of authority was utterly abrogated at the accession of the Prince of Orange, and since the beginning of his reign no English sovereign has asserted it, or, indeed, even in any manner withheld the royal assent from the passage of any Act of Parliament whatever.

Under our system of government, based as it is upon a written constitution, defining distinctly the measure of power to be exercised by the Executive Department, the authority to dispense with a statute, either in a particular instance or altogether, by withholding it from the depository of the law in the proper office, has not been conferred.

The Statute of 1852, as we have seen, declares in *totidem verbis*, that a legislative bill, situated as this one is, "*shall be authenticated by the Governor*," etc.   Whether, then, we regard the mere nature of the act to be done or the mandatory language in which its performance is enjoined, it is impossible to conceive of any case in which there could be less discretion left to the officer, whose duty is thus declared by statute.

The authentication and deposit of this law in the office of the Secretary of State is "emphatically "an act which the law specially enjoins as a duty resulting from an office, trust or station," within the letter and intent of the statute regulating the writ of mandamus in this State.   (Statutes 1851, p. 124, Sec. 467.)

And it is settled by the uniform adjudications of this Court that in *such a case* the writ will be issued against the Governor of the State to enforce the performance of the act

CAL. REP. XXXIX. —27.

.required. (*McCauley* v. *Brooks*, 16 Cal. 11; *Middleton* v. *Low*, 30 Cal. 596; *Stuart* v. *Haight*, January Term, 1870.) These authorities are supported by numerous cases adjudicated in other Courts. In the case of *Marbury* v. *Madison* (1 Cranch. 137) it was declared by the Supreme Court of the United States that "it is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is determined." In the case of *Amos Kendall, Postmaster General of the United States, plaintiff in error,* v. *The United States on the Relation of Stokes* (12 Pet. 594), a writ of mandamus was sought against the Postmaster General of the United States, and its issuance was resisted by Mr. Attorney General Butler. On the argument the Attorney General. conceded the constitutional power of Congress to invest the proper Courts of the United States with jurisdiction to issue writs of mandamus to any ministerial officer of the United States to compel the performance of his duty. "And as the ordinary character of an officer's functions would not always determine the true nature of a particular duty imposed by law, he further agreed that if an executive officer, the head of a department, or even the President himself, were required by law to perform an act merely ministerial and necessary to the completion or enjoyment of the rights of individuals, he should be regarded, *quo ad. hoc*, not as an executive, but as a merely ministerial officer, and, therefore, liable to be directed and compelled to the performance of that act by mandamus, if Congress saw fit to give the jurisdiction."

And the opinion of the Court, as delivered, is in accordance with this view.

In *Chamberlain* v. *Sibley*, the Supreme Court of Minnesota say: "This Court will not undertake to compel the Governor of the State to the performance of any duty devolving upon him as the Chief Executive, and properly pertaining to his office. In all such matters the Executive is necessarily independent of the Judiciary; but when some official act, not necessarily pertaining to the duties of the Executive of the State, and which might be performed as well by one officer

as another, is directed by law to be done by the Governor, then any person who shows himself entitled to its performance, and has no other adequate remedy, may have a writ of mandamus against such officer, even though the law may have designated the Chief Executive of the State to perform the duty. We do not think that in such cases there is any ground for distinguishing the Chief Executive from any other officer who may be designated to do a mere ministerial act; otherwise à party might be entirely without remedy." (4 Minn. 312.)

The Supreme Court of Ohio, in the case of *The State ex rel. etc.* v. *S. P. Chase (Governor)*, say: "However, therefore, the Governor, in the exercise of the supreme Executive power of the State, may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial power—yet in regard to a mere ministerial duty enjoined on him by statute, which might have devolved on another officer of the State, and affecting any specific private right—he may be made amenable to the compulsory process of this Court by mandamus." (5 Ohio State, 535; see, also, the case of *Cotton* v. *Ellis*, 7 Miss.; N. C. 550.)

We are aware that there are authorities which hold that the Executive is, *in no instance*, subject to the process of mandamus, because he is the chief of ⎣ ⎤ co-ordinate department of the Government. "But," in the language of a late commentator upon the law of mandamus, "the better doctrine seems to be that the Governor is not an exception to the general rule, that all public officers may by mandamus be compelled to perform an act clearly defined and enjoined by the law, and which is merely ministerial in its nature, and neither involves any discretion nor leaves any alternative." (Moses on Mandamus, 82.)

It is said, however, that by the terms of the statute regulating the writ of mandamus in this State, it can only be issued to an "inferior" person, and that the Executive cannot be considered to be such a person.

The language of the statute in this respect is as follows: "It may be issued by any Court in this State (except a

Justice's, Recorder's, or Mayor's Court), to any inferior trib-
unal, corporation, board, or person, to compel the perform-
ance of an act," etc.

It is obvious that the word "inferior," as here used, is a
qualification confined to the word "tribunal." The inten-
tion was to prevent any Court from issuing the writ to
any other Court superior in authority to itself, in any case
in which the writ should be directed to another tribunal; it
must, therefore, be one "inferior" to the Court issuing the
writ. As thus applied, the word "inferior" has a familiar
signification—for, "superior" and "inferior" are terms ap-
plied to the Courts as indicating the general character of the
jurisdiction they respectively exercise.

But, as applied to a "person," the word "inferior" has no
intelligent signification. Who is, in law, an "inferior" per-
son? Who, in this sense, a superior one? It is assumed, too,
by the Attorney General in the inquiry he has submitted,
that the mere issuance of the writ of mandamus to the Exe-
cutive imports, upon the part of the Court, a claim of official
superiority over that officer. Nothing could be more un-
founded. In the nature of things no comparison between
the authority of the Governor and that of this Court can be
instituted. His duties are entirely executive in their nature
—ours, exclusively judicial. Upon him rests the great obli-
gation to see that the laws are faithfully executed; but it
belongs to the nature of the judicial office to interpret and
authoritatively declare the meaning of the laws applicable
to the vested rights of the citizen.

And upon principle it would seem that, if the petitioner
has a vested right by law to have the bill in question authen-
ticated, the mere circumstance that the person whose duty
it is to direct the act to be performed is an officer, even the
chief officer of the Executive Department—and as such, in
the discharge of other and important duties, should not
either impair the right or embarrass its assertion. The
duty to direct the authentication imposed upon the Governor
by the statute might have been enjoined upon any other
executive officer—and in such case, would it be pretended
that its performance could not be enforced? It might have

been made part of the official duty of the Secretary of State, independently of any direction to him by the Governor, to affix the appropriate certificate to the bill; and in that case, would it be any answer to say that he was an executive officer, and as such invested with executive discretion and authority in reference to certain other matters not involved in this question? And if it be conceded that the Governor, because he is chief of the Executive Department, enjoys for that reason an absolute immunity from all judicial process—even when his duty in the given instance is ministerial—and a citizen has a vested right to have it performed, may not the same exemption from judicial process be set up by other officers of the Executive Department?

Would the Attorney General, the Controller, the Treasurer, and the other great officers of State, by reason of their mere official rank, be beyond the reach of the process of the law in all cases, and not be compelled to perform any official act, no matter how distinctly enjoined upon them? And if the State officers of the Executive Department are to be clothed with this immunity, it must be remembered that the Sheriffs, Recorders, etc., in the several county organizations, are also members of the Executive Department—and upon what principle could one of them be compelled to perform his duty in any case? It seems to us that the assertion of such a doctrine would draw after it the most serious complication and confusion, both in public and private rights, and practically disrupt the whole fabric of government.

We think that the writ should issue as prayed for, and it is so ordered.

CROCKETT, J.. concurring:

I concur in the judgment and in the process of reasoning by which Mr. Justice WALLACE has reached the conclusion, that the bill in question was not returned to the Senate, in the sense of the Constitution, within the ten days allowed for the purpose by that instrument, and that it has, consequently, become a law without the signature of the Governor. From this conclusion, it necessarily results that it is

the duty of the Governor to deposit the bill in the office of the Secretary of State, and to cause it to be authenticated, as required by law. But it is due to the respondent to state, that I do not understand him to maintain, as might possibly be inferred from some portions of the opinion, that he has the constitutional right, or any authority whatsoever, to set aside a statute duly passed, and which has become a law under the forms of the Constitution; or by retaining it in his possession, after it has become a valid, constitutional enactment, to defeat its operation as such. On the contrary, he claims that the bill in question failed to become a law, and for that reason ought not to be authenticated as such; and this is the principal question submitted for our decision, under the agreed statement of facts. It appears to me to be scarcely just to the respondent, to impute to him, even by inference, a design "to dispense with a statute, either in a particular instance or altogether, by withholding it from the depository of the law in the proper office;" and certainly there is nothing in this record, or in his official conduct, so far as we can take judicial cognizance of it, to justify the inference that he arrogates to himself the power claimed by the earlier sovereigns of Great Britain, to alter and amend bills at pleasure, "before according the royal approval." If any such inferences are deducible from the opinion of Mr. Justice WALLACE, I do not concur in them.

But I assent to the conclusion at which he has arrived, that in respect to merely ministerial duties, involving the exercise of no discretion, all the officers of the Government, from the highest to the lowest, are amenable in proper cases to the writ of mandate. Any other rule than this would be subversive of private rights, and incompatible with a fundamental principle of republican government, to wit: that all public officers can be compelled by law to perform merely ministerial acts and duties involving the exercise of no discretion. This Court, I trust, will always carefully abstain from any attempt to infringe upon the constitutional rights or functions of the Executive or Legislative Departments, and if I entertained a reasonable doubt whether or not the retention of this bill in the possession of the Governor was

a matter which, in the slightest degree, rested in the exercise of his discretion as a co-ordinate branch of the government, I should feel it to be my duty to deny the writ, rather than to issue it in a doubtful case, involving the constitutional rights of the chief executive officer of the State. But I concur fully in the reasoning of Mr. Justice WALLACE, to the effect that the bill having become a law, the Governor has no discretion in the premises, and it is incumbent on him, as a ministerial duty resulting from his office, to deposit it with the Secretary of State, that it may be properly authenticated. It was suggested on the argument, that it could not have been within the contemplation of the Constitution and laws that the Governor should be amenable to the writ of mandate, inasmuch as the Court would be powerless to enforce its process in case it was disobeyed. But it is not to be presumed that the chief executive officer of the State would resist the authority of its highest judicial tribunal. It is true, the history of the Federal Government, within the last ten years, furnishes a humiliating instance in which the authority of the Supreme Court of the United States to enforce obedience to a writ of *habeas corpus,* was defied by the Executive Department of the Government. But whatever palliation there may be of this open defiance of the authority of the Court, is to be found in the existence of a fierce civil war, which threatened the stability of the Government, and, for a time at least, it is feared, relaxed the reverence of the people for constitutional obligation. It is to be hoped, however, that this will be the last, as it was the first instance, in which the authority of the Court, acting within its admitted jurisdiction, has been openly set at defiance by a co-ordinate branch of the Government. In clothing this Court with the power to enforce its authority, by process for contempt and by other methods, the Legislature, doubtless, contemplated that the power would be discreetly exercised in furtherance of the public good ; and though, I trust, if there should occur in any case a contumacious defiance of its authority, the Court would enforce its process by whatever lawful and proper methods it could employ; nevertheless, I apprehend there is no reason to fear that in this

or any other case, an executive officer will refuse to obey the process of this Court, in a cause clearly within its jurisdiction. If, in any case, such an emergency should arise, we would deal with it as our sense of duty might dictate under all the circumstances. But no argument against the existence of the power to issue the writ, can be founded on the supposed difficulty of enforcing it in a given case. It will be time enough to deal with that question when it shall arise.

TEMPLE, J., dissenting:

I agree with Mr. Justice WALLACE in his conclusion, that the bill was not returned to the Senate within the meaning of the Constitution, but do not think this Court has jurisdiction to issue the mandate to the Governor, for the following reasons:

*First*— It is by no means clear that the writ of mandamus is the proper remedy of the petitioner. If it be admitted that the bill became a law without reference to the certificate of the Secretary of State, then it must follow that the petitioner is not entitled to this remedy, for this extraordinary writ will not issue where the parties have any other plain, speedy and adequate remedy, and this Court ought not to assume jurisdiction unless the act to be done is essential to the rights of the petitioner. The only reason why the petitioner can compel the performance of the act in question is, that it may afford an official record of the acts of the Executive in regard to the bill. If we can go behind that record for the purposes of this proceeding, and ascertain the real facts, it can be done in a direct proceeding under the Act itself—it having been assumed to be, and having been acted upon as a law.

*Second*—The petitioner has no such interest in the act required to be done as will authorize him to ask for this relief. Nor are we foreclosed from this inquiry by the terms of the stipulation, that the petitioner has such an interest in the event of these proceedings as makes him a proper party thereto. The facts show that no one can have such an interest in it, and this goes to the sufficiency of the agreed statement

and to the jurisdiction of the Court. If it is possible to imagine circumstances which would give the petitioner a vested interest, we can suppose he has that under the terms of this stipulation. The purpose of the bill appears, from the agreed statement, to be "to make, open and establish a *public* street in the City and County of San Francisco." What vested, private or individual right can any one have acquired under this bill? Certainly no one has a vested right in a public highway which has never yet had an existence. If the petitioner is owner of the land proposed to be taken for the highway, does that constitute a vested right under this bill? If Government has resolved to take private property for public use, does that give the person whose property is about to be taken a right in the proceedings? Can one have a right to be despoiled? If the petitioner can have no specific right in the proceedings in either respect mentioned, it would seem to be evident that he can have no individual interest in the matter. His interest is the same as any member of the community affected by the statute. His rights are simply those of a citizen to have a public law executed, and not less so because it would confer a pecuniary benefit upon him.

Now all the cases upon the subject, whether the writ be asked against the Governor or any other officer, go upon the ground that some person has a vested or individual right, which requires the exercise of this extraordinary jurisdiction to enforce or preserve ; and I venture the assertion that no Court has ever yet attempted to command the Governor of a State to perform a public duty in the execution of a public law, when no one had any individual interest in the matter and there was no private or vested right to protect or enforce. In *Marbury* v. *Madison*, the Court speak of the right which will support such a writ as a vested right or an individual right. It is said by Mr. Attorney General Butler, whose opinion is quoted and relied upon in the leading opinion, that it must be a ministerial duty, imposed for the benefit of a private party, and also that it must be to protect

a vested right; and this is taken for granted in the leading opinion.

The startling nature of a contrary doctrine will be better appreciated if it is borne in mind that each of the District Courts has the same jurisdiction to issue the writ to the Governor which this Court has; and, therefore, whenever, in the opinion of any citizen, the Governor refuses to perform some public act required of him by law, any of these Courts can interfere and direct him to act. I do not suppose my associates intend any such conclusion : but it is clearly the effect of the case, and the objection to our jurisdiction is of such a nature that it cannot be waived. Suppose the writ were issued and not obeyed ; . even then, upon an application to commit the respondent for contempt, it could be made to appear that the act required to be performed is one in which no person can have a private, vested right.

*Third*—The question as to whether the writ should issue to the Governor in any case is perhaps more difficult; but if it be admitted that there are some duties imposed upon the Governor by law, and which might have been imposed upon any other person, and that, as to such acts, when no discretion is allowed, the Courts may interfere, it is nevertheless clear, that as to all duties devolved upon the Executive by the Constitution, he is absolutely independent of judicial control. This doctrine is clearly expressed in *Marbury* v. *Madison*. The idea there is, that all the executive powers of the Government are lodged in the President, and the writ can in no case be directed to him ; and this is expressly admitted by the counsel for Marbury. The heads of the departments, however, have a double character. In one they are recognized as the agents of the President, and in that character their duties are executive, and the Courts will not interfere with their discharge of those duties, whatever may be the degree of discretion allowed. In the other character they perform duties especially enjoined by law, and which might have been entrusted to any other persons ; as to such duties these officers are not exercising powers exclusively reposed in the Executive, and the Courts may interfere to control their action, upon the same principles as

in other cases.  In *Kendall* v. *The United States* (12 Peters, 524), the Supreme Court of the United States has expressed this idea more clearly.  "We shall not, therefore, enter into any particular examination of the line drawn between the powers of the Executive and Judicial Departments of the Government.  The theory of the Constitution undoubtedly is, that the great powers of the Government are divided into separate departments; and so far as these powers are derived from the Constitution, the departments may be regarded as independent of each other.  But beyond that, all are subject to regulations by law, touching the discharge of the duties required to be performed.

"The executive power is vested in a President; and as far as his powers are derived from the Constitution, he is beyond the reach of any other department, except in the mode prescribed by the Constitution through the impeaching power. But it by no means follows that every officer in every branch of that department is under the exclusive control of the President.  Such a principle, we apprehend, is not, and certainly cannot be claimed by the President" (p. 609.)  And this doctrine is recognized in *Middleton* v. *Low*, and, indeed, in all cases upon this subject.

An act in which an officer has no discretion, is not necessarily a ministerial act.  A ministerial act is the act of a servant—one who acts under the direction of a superior, as the Sheriff and clerk are ministers or servants of the Court, and as those officers who perform duties wholly prescribed by the Legislature, and exercise no powers given by the Constitution, are said to be ministers or servants of the law. The Constitution requires the Senate of this State to keep a journal of its proceedings.  In this matter it is allowed no discretion.   We can easily understand how some person might have a private interest in a proceeding of the Senate. If the Senate should refuse to allow a resolution which had duly passed, and in which some of its employés, for instance, have an interest, to be entered upon its journal, would we compel the Senate by mandamus so to enter it?   The Senate has no discretion, and a vested private interest is at stake; but still, so far as the Senate is concerned, the act is not a

ministerial act. It derives its power from the Constitution, and in its exercise has no superior.

Could the act required by the Governor have been performed by any other officer if the Legislature had so provided? That the duty might have been enjoined upon any other person, is asserted in the leading opinion. I apprehend, however, that the object of the certificate is to make a record of the action of the Executive in the proceeding. From the nature of the act, it must be done under the direction of the Governor, and the statute only prescribes the mode of attesting the exercise of one of the highest executive powers reposed in him by the Constitution.

The Legislature might have provided that the Governor should keep his journal, in which he should enter what action he had taken upon the bills presented to him, and there would be just as much propriety in our compelling him to make an entry in such journal as to compel him to make the certificate in question. The Governor says he returned the bill in question to the Senate within the Constitutional period. We require him, nevertheless, to enter in the record he is required to keep of such executive acts, that he did not return it. It would seem almost self-evident that, so far as this certificate is concerned, the Governor must decide for himself, although his decision may not prevent the Courts from holding the law valid in any controversy in which the rights of parties are directly involved. At any rate, if the certificate is the essential thing, this Court might as well interfere in the first instance, and direct what action shall be had with reference to a bill as to compel him to certify that he has performed a certain act, which he denies; for the certificate is, in effect, that he has *not* returned the bill to the Senate. We require him to certify an executive act, but do not leave it to him to say what that act was. Nor will the fact that the Legislature has prescribed the mode in which the Executive shall evidence his action, or even the forms or modes in which he shall exercise his powers, authorize the Courts to interfere to control such action with reference to powers expressly and exclusively vested in him by the Constitution. The Legislature has prescribed

the mode of making application for pardons, and absolutely directs the Governor, in certain cases, to issue to convicts absolute and unconditional pardons. No discretion whatever is allowed. Would this Court, under the pretense of executing this law, interfere with the exercise of the pardoning power vested in the Governor by the Constitution? The true theory is that, as to such laws, so far as executive action is concerned, the Courts can exercise no coercive power, although they may, perhaps, declare the executive act invalid in a controversy properly before them. Any other view utterly destroys the independence of the Executive in any respect whatever.

It is said that this would place the Governor above the law. It is evident that there must be some final arbiter upon every question that can arise in the Government. As to a large class of questions, affecting private rights, too, it is admitted that the final decision is with the Executive, and I have no doubt it extends to all matters especially entrusted to him by the Constitution, whatever the degree or character of the discretion allowed. Upon this subject, I fully agree with Mr. Chief Justice Caton, in *The People* v. *Bissell*, (19 Ill. 229.) In a most conclusive argument upon this very subject, he says : ''As from necessity and the very nature of all government there must be an ultimatum somewhere, whose duty it is to determine whether such sphere has been passed or not; that duty in most cases falls on the Judicial Department, from the fact that in this department is reposed the responsibility of enforcing or giving effect to the acts of the other departments. But it is only when thus called upon in some form known to the law to give effect to such acts of the other departments, that the Judiciary can determine whether such acts were done in the exercise of a constitutional power. In no other way, nor in any other case, can this department construe the Constitution for, or exercise any control over, any other department. Where final action upon any subject is confided to either of the other departments, there the responsibility must rest of conforming such action to the law and the Constitution.

''It is because such final action is generally devolved upon

the Judiciary, that the Judiciary is most frequently called upon to give a final and conclusive construction to the Constitution and laws. It results, therefore, from this philosophical arrangement of our governmental system, that the control which the Judicial Department exercises over the others, is of a restraining and not of a compulsory power. But this is only practically and not literally so. We may not enjoin the others from doing an unconstitutional act, but by refusing to give effect to such act, or relieving against it when properly and judicially applied to for that purpose, we may restrain them. We cannot restrain the Governor from issuing the bonds of the State contrary to law, but when the question is properly presented before us, we can declare such bonds void; and so of a patent for the public land which he might issue. And so if he should step beyond his constitutional sphere, and unlawfully imprison a party, we would discharge such party on *habeas corpus.* But we have no power to compel either of the other departments of the Government to perform any duty which the Constitution or the law may impose upon them, no matter how palpable such duty may be, any more than either of those departments may compel us to perform our duties. The Governor is and must be as independent of us as is the Legislature, or as we are of either of them.     *     *     *     *     *     *     *
It is urged upon us that in a government of laws there must be an adequate remedy for every wrong; and that where a clear right exists, there must be some mode of enforcing that right. While human society is governed by so imperfect a being as man, this can be true only in theory. If we are to compel the Governor or the Legislature to right every wrong which may arise from their omissions of duty, the surely they must, in order to make this Utopian system perfect, have the power to compel us to do right in every case. May it not be as well supposed that we will act perversely, and refuse to perform a duty imposed upon us, to the injury of the citizen, as that the Governor will do so? In the formation of the Government, equal confidence was rightfully reposed in each department, to which appropriate and independent duties were assigned. If we unintentionally

err, and do a party ever so great a wrong, there is, and, from the nature of our institutions, can be, no remedy. If we perversely or corruptly do an intentional wrong, the Constitution has provided the only remedy, which is by impeachment; and so of the Executive. When acting within the limits assigned to each, neither can control or dictate to the other. The presumption is, that one is as likely to be right, or as liable to err, as the other. (See *Georgia* v. *Towns*, 8 Geo. R. and *Hawkins* v. *The Governor*, 1 Ark. R. 570.)

I do not think it proper to anticipate the course of the Executive if this writ should issue, but in the fact of a possible collision between the departments, I see cogent reasons why we should be reluctant to assume the jurisdiction. It was said by Mr. Jefferson that, had the writ been issued in the case of *Marbury* v. *Madison*, Mr. Madison would not have obeyed it, and that he (Jefferson) would have sustained Mr. Madison with all the power at the command of the President. It is said in the case of *Low* v. *Towns* (8 Geo. 360), that, if there were no other reason, the duties of the Chief Executive would forbid the issuance of the writ. We ought not to issue the writ, unless we are prepared to enforce it. And if the Governor be imprisoned but for one hour, the public safety is jeopardized; for, during that very time, it may be necessary for him to exercise his high powers to preserve the public peace,