THE STATE OF OHIO, EX REL. LEWIS WHITEMAN AND OTH-
ERS, *v.* SALMON P. CHASE, GOVERNOR OF THE STATE.

Although the governor, in the exercise of the supreme executive power of the State, may, from the nature of his authority, have a discretion which cannot be controlled by judicial power, yet in regard to a ministerial act which might have been devolved on any other officer of the State, and affecting any specific private right, he may be made amenable to the compulsory process of this court by mandamus.

The issuing of a proclamation by the governor, pursuant to the 11th section of the banking law of 1845, setting forth that a company organized as a branch of the State Bank was authorized to commence and carry on the business of banking, was not one of the duties enjoined by the constitution on the governor and resting in the supreme executive discretion, but a ministerial act required by statute, which, upon his being satisfied of the existence of certain facts, the governor, upon neglect or refusal, might have been compelled, by a writ of mandamus, to perform, had the statutory authority continued in force.

The act to incorporate the State Bank of Ohio and other banking companies, passed in 1845, having authorized a specified and limited number of banking companies in each of the twelve districts, five of which were authorized in the district including Hamilton county, and having also provided that each of such companies should be held and adjudged a body corporate with succession, until May 1st, 1866, and also having expressly provided that *the number of such banking companies, authorized to be "formed and to engage in business in Hamilton county, shall not exceed four"*; and five of such companies having been already formed, and having in *good faith* engaged in business in said district, four of which were in Hamilton county, the powers in this respect, authorized by the statute, were exhausted; and in case of the failure or surrender of the franchise by some of such companies, this statute does not authorize new and additional companies to be formed, and, to engage in business in Hamilton county, to take the place of the failing companies.

By a settled rule of construction, statutes conferring special privileges in derogation of common right, are to be strictly construed; and authority to create new corporations cannot be derived from mere implication.

The amendatory act of 1848, to the banking law of 1845, has no application to *the authority* for forming new and additional banking companies in Hamilton county, the same not arising out of the matter of the distribution of the fractions of unappropriated banking capital.

THIS is an application for the allowance of a writ of peremptory mandamus.

The relators allege that they have organized a banking association, as a branch of the State Bank of Ohio, at Cincinnati, in Hamilton county, denominated the Cincinnati Branch of the State Bank, which has been found, upon due examination, under the direction of the board of control, to have complied with the provisions of the act to incorporate the State Bank of Ohio and other banking companies, passed February 24th, 1845, and therefore lawfully entitled to commence and carry on the business

34

of banking, at the place of its location; and that upon proper application made to the defendant, as the governor of the State, to issue his proclamation as required by the statute, setting forth that the company is duly authorized to commence and carry on that business, he has refused to perform the duty enjoined upon him. The relators, therefore, invoke the compulsory process of this court, requiring the performance of such alleged duty.

It is provided, in the eleventh section of the act to incorporate the State Bank of Ohio and other banking companies, that if, upon the requisite examination, report a. d statement, it shall be found that the company has complied with the provisions of the law, and is lawfully entitled to commence the business of banking, the same shall be certified to the governor, " *who shall, if he be satisfied that the law has in all respects been complied with,* issue his proclamation, *setting forth* that such company *is authorized to commence and carry on the business of banking,* at the place designated in its certificate of association."

In the reply of the governor to the application made to him, which is attached to the petition in this case, he expresses his doubts, whether the formation of this banking association comes within the authority of either the banking law of 1845, or the amendment thereto of 1848; and whether their provisions, relating to the formation of *new companies,* are not inconsistent with the provisions of the present constitution of the State concerning corporations, and, therefore, declines to issue the proclamation, in the language following: " *Not being satisfied that the law has been in all respects complied with,* because not fully satisfied as to the construction and validity of the statutory provisions with which compliance is required, I prefer to refer the questions involved to judicial decision, by *declining to issue the proclamation applied for.*"

*A. G. Thurman,* and *N. H. Swayne,* for the relators, relied on the following points: 

1st. That the duty which the governor of the State was asked to perform, was merely *ministerial,* and that it was within the power of this court to require its performance, by mandamus.

The State, ex rel. Whiteman et al., *v.* The Governor of Ohio.

2d. That the right to have the branch of the State Bank of Ohio, sought by this proceeding, is a *vested right* of the State Bank and her branches, and, therefore, unaffected by the new constitution.

3d. That whether it be a vested right or not, the constitution does not prohibit the creation of the branch.

4th. That the statute of 1845, incorporating the State Bank of Ohio and other banking companies, authorized the creation of the branch bank in question ; but

5th. If it did not, that the amendatory act of 1848 authorized it.

*C. P. Wolcott,* attorney general, for the governor, insisted on the following points :

1st. That the official action of the governor cannot be controlled by mandamus, or otherwise.

2d. That the writ of mandamus will not issue against a public officer, unless to compel the performance of an act clearly defined and enjoined by the law, and which is, therefore, *ministerial* in its nature ; that the constitution assigns to the governor no ministerial, as distinguished from political duties ; and that the duty of the governor, prescribed by the bank law of 1845, the performance of which is sought, called for the exercise of judgment and discretion, and that consequently the decision of the governor was conclusive.

3d. That the authority to form banking companies in the county of Hamilton, under the bank law of 1845, and its amendments, has been exhausted.

4th. That the bank law of 1845, and its amendments (same as to rights vested under it by the previous formation of companies), ceased to have the force of law on the first day of September, 1851, by the operation of the new constitution of the State.

In support of the last proposition, the attorney general's views are stated as follows :

The banking act of 1845, and its amendments (save as to

rights vested under it before that time), ceased to have the force of law on the first day of September, 1851. Its vigor was extinguished by the abrogation of the old constitution.

1st. The government being one of delegated as well as limited powers, no act can have the force of law which does not find an affirmative support in some power granted by the constitution. It is not enough that it is not prohibited; it must be authorized. This is not only the necessary result of fundamental principles, but it has been so judicially held by this court. *C. W. & Z. R. R. Co.* v. *Commissioners of Clinton Co.,* 1 Ohio St. Rep. 77; *Kent* v. *Mahaffy,* 2 Ib. 498.

2d. The act of 1845, then, derived its operative force from the powers delegated by the constitution of 1802, and depended on them for its support. When therefore the people, on the first day of September, 1851, exercising an imprescriptable right, resumed the powers delegated by that instrument, the act of 1845 fell with, and as a consequence of, that resumption. Stating the proposition more generally, all legislation in force on the first day of September, 1851, was abrogated by and with the abrogation of the government, of which such legislation was a part. It perished by the extinction of its vital principle.

3d. To guard against the evils of the interregnum that must otherwise have intervened between the two systems, the people adopted the schedule, saving all such former laws as were consistent with the new government. This schedule is no part of the constitution proper; it is a mere legislative provision, and is obviously to have the same effect and construction as if it had been passed by the first general assembly of the new government. Of itself, it imparted no vitality to past legislation; but to so much thereof as came within the scope of the powers delegated by the constitution, it provided a medium through which it might derive life and vigor from those powers, and be thereby made incorporate with the new government.

4th. As no act can have any validity or force except as it is warranted by a constitution, and as there is only one constitution or source of power operating in the State, it follows that all acts,

whenever passed, which are not within the scope of the powers delegated by that instrument, are absolutely void.

5th. But the constitution has not only withheld the power to enact, but has emphatically prohibited the enactment of laws similar to that of 1845. Finding no support in the constitution, that act necessarily and inevitably ceased to exist.

6th. If these positions are true, and they seem to stand on immovable foundations, the decision in the case of *Cass* v. *Dillon*, 2 Ohio St. Rep. 607, is in direct conflict with principles fundamental to all republican governments, and if not overruled, the doctrines of that decision ought not to be pushed one step beyond the very circumstances under which it was made.

7th. That decision, even if adhered to, has no application to the present case. Its chief ground was, that the constitutional provision then under consideration did not prohibit subscriptions by counties to the stock of railroad companies, but simply prevented future legislation authorizing such subscriptions. But the provisions of the constitution applicable to this case, interdict not only the passage of an act similar to that of 1845, but the creation of any corporations, except under a general law. Art. XIII, secs. 1, 2. There, legislation alone was forbidden; here, both legislation and act are forbidden.

BARTLEY, C. J.

The following questions have been discussed, and are presented for determination in this case :

1st. Whether the governor can be controlled in his official action by the authority of a writ of mandamus from the Supreme Court ?

2d. Whether the authority to form banking companies, in the county of Hamilton, under the act to incorporate the State Bank of Ohio and other banking companies, passed February 24th, 1845, and the amendment thereto passed in 1848, has been exhausted, so that, in case of the failure or surrender of the franchise by some of the companies heretofore organized, new or additional companies cannot be formed in that county, to take the place of the failing companies ?

3d. Whether the authority to form banking companies under the banking law of 1845, was abrogated by the operation of the constitution of the State, which took effect in September, 1851?

Of these in their order:

1. Can the chief executive officer of the State be directed or controlled in his official action by proceedings in mandamus? It is claimed on the part of the defense, that, inasmuch as the government is by the constitution divided into the three separate and coördinate departments, the legislative, the executive, and the judicial; and inasmuch as each department has the right to judge of the constitution and laws for itself, and each officer is responsible for an abuse or usurpation, in the mode pointed out in the constitution, it necessarily follows, that each department must be supreme within the scope of its powers, and neither subject to the control of the other, for *the manner* in which it performs, or its *failure* to perform, either its legal or constitutional duties. This argument is founded on theory rather than reality. That each of these coördinate departments has duties to perform in which it is not subject to the controlling or directing authority of either of the others, must be conceded. But this independence arises not from the grade of the officer performing the duties, but the nature of the authority exercised. Under our system of government, no officer is placed above the restraining authority of the law, which is truly said to be universal in its behests—" all paying it homage, the least as feeling its care, and the greatest as not exempt from its power." And it is only where the law has authorized it, that the restraining power of one of these coördinate departments can be brought to operate as a check upon one of the others. The judicial power cannot interpose and direct in regard to *the performance* of an official act which rests in *the discretion* of any officer, whether executive, legislative or judicial. In *Marbury* v. *Madison*, 1 Cranch Rep. 170, Chief Justice Marshall said: "It is not by the office of the person to whom the writ is directed, *but the nature of the thing to be done*, that the propriety or impropriety of issuing a mandamus is to be determined."

The constitutional provision declaring that " the supreme ex-

ecutive power of this State shall be vested in the governor," clothes the governor with important political powers, in the exercise of which he uses his own judgment or discretion, and in regard to which, his determinations are conclusive. But there is nothing in the nature of the chief executive office of this State which prevents the performance of some duties *merely ministerial* being enjoined on the governor. While the authority of the governor is *supreme* in the exercise of his political and executive functions which depend on the exercise of his own judgment or discretion, the authority of the judiciary of the State is *supreme* in the determination of all legal questions involved in any matter judicially brought before it. Although the State cannot be sued, there is nothing in the nature of the office of governor, which prevents the prosecution of a suit against the person engaged in discharge of its duties. This is fully sustained by the analogy of the doctrine of the Supreme Court of the United States, in the case of *Marbury* v. *Madison*, 1 Cranch Rep. 170.

However, therefore, the governor, in the exercise of the supreme executive power of the State, may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial power, yet in regard to a mere ministerial duty enjoined on him by statute, which might have been devolved on another officer of the State, and affecting any specific private right, he may be made amenable to the compulsory process of this court by mandamus.

The official act of the governor in question, in regard to issuing the proclamation asked for, is a duty prescribed by statute, not necessarily connected with the supreme executive power of the State, *ministerial* in its nature, and a duty which might have been enjoined on some other officer. It is contended that this duty rests in the discretion of the governor, by virtue of the provision requiring that " he shall, *if he be satisfied that the law has, in all respects, been complied with*, issue his proclamation," etc. The facts connected with the organization of the company, and the other essential preparations preliminary to the com-

mencement of the business of banking, are required to be certified to the governor; and on finding that the law has been complied with in these respects, the proclamation is required. The duty is *imperative* on his being satisfied of a given state of facts. It is his duty to look into the evidence presented to him, and act on a given state of facts. He has no uncontrollable power of judgment as to either the law or the facts. On his finding the existence of the requisite fact, the law is *peremptory* in requiring the performance of the duty. True it is, if the evidence presented be not clear and satisfactory as to the compliance with the requirements of the law, but leaves ground for doubt, the act is not authorized. The duty enjoined, therefore, although subject to a condition, is *ministerial* in its nature.

The governor, in his letter to the president of the board of control, refusing to issue his proclamation, expressly admits that he is satisfied as to the existence of the requisite state of facts, and places his refusal solely on the ground of the legal difficulties which are presented. This letter, which bears evidence of mature consideration by the governor, is as follows:

STATE OF OHIO, EXECUTIVE DEPARTMENT, }
Columbus, November 29, 1856. }

*Dear Sir*—It has been certified to me by the board of control of the State Bank of Ohio, that the Cincinnati Branch of the State Bank, at Cincinnati, in Hamilton county, a banking association recently organized as a branch of the State Bank of Ohio, was found, upon examination, made under direction of the board, to have complied with the provisions of the act to incorporate the State Bank of Ohio and other banking companies, and therefore to be lawfully entitled to commence and carry on the business of banking at the place of its location; and I am desired to issue my proclamation, setting forth that the company is authorized to commence and carry on that business.

Before issuing such a proclamation, the statute requires me to be "satisfied that the law has been in all respects complied with." In obedience to this requirement, I have examined the statutory and constitutional provisions bearing upon the subject, and have endeavored to ascertain the precise state of facts presented by the application.

*There is no question as to the right of this company to commence and carry on the business of banking, provided any new banking company can now be organized in Hamilton county, under the provisions of the banking acts of* 1845 *and* 1848.

By these acts the counties of Hamilton, Clermont, Brown, Clinton, Warren and Butler were constituted the first district; the number of banking companies in the district was restricted to five, with an aggregate capital not ex-

The State, ex rel. Whiteman et al., *v.* The Governor of Ohio.

ceeding one million two hundred thousand dollars. Of these banking companies, four might be formed in Hamilton county.

Five banking companies have been formed in the district under this act, and four in Hamilton county, with an aggregate capital of $719,000, leaving unappropriated capital to the amount of $481,000.

Of the companies thus formed in Hamilton county, one, the Mechanics and Traders' Branch, has become insolvent, and is in the hands of a receiver; another, the Franklin Branch, has withdrawn its capital and closed up; and a third, the City Bank, has closed its doors and suspended business.

There is, therefore, at present, but one company engaged in banking business in Hamilton county under this act, with a capital of only $50,000.

The questions which arise upon this state of facts, in view of the various constitutional provisions and legislative enactments applicable to them, are these :

1. Is the privilege of forming banking companies in the county of Hamilton, which was granted by the act, exhausted by the formation of the four original companies organized under it; or may new banking companies be formed in place of such as have relinquished business and withdrawn their capital, or have become insolvent and lost their capital?

2. Is the restriction upon the number of banking companies to be formed in the several counties and districts created by the act of 1845, removed by the act of 1848, so that new banking companies may be formed in any county of any district where there is unappropriated capital, until the whole amount of capital assigned to the district, or capable of transfer to it, shall have been taken up?

3. Are the provisions of the banking acts of 1845 and 1848 relating to the formation of new companies, inconsistent with the provisions of the constitution of 1851 concerning corporations, so that no new banking company can be formed under those acts?

These are questions of great interest and importance, and ought not to be determined by the executive, whose decisions possess no judicial authority, in such a manner as to inflict, in case of error, serious injury upon extensive interests and great numbers of individuals. In the present case, if the desired proclamation should be issued, and the company should commence business, invest a large amount of capital in notes, bills and other securities, issue a large amount of circulating notes which would necessarily find their way into the possession of numerous persons, and contract other liabilities incident to its business, it is not impossible that, by judicial decision, the whole proceeding might be declared unauthorized by law or prohibited by the constitution, and therefore void. It is not easy to estimate the evil consequences which might thus arise to the officers of the company, its stockholders and the community.

*Under these circumstances, not being " satisfied that the law has been in all respects complied with," because not fully satisfied as to the construction and validity of the statutory provisions with which compliance is required, I prefer to refer the questions involved to judicial decision, by declining to issue the proclamation applied for.*

Yours respectfully,          S. P. CHASE.

DR. J. ANDREWS, *President Board Control.*

With a clear and accurate conception of his own duty thus expressed, the governor does not assume the exercise of a discretion in regard to the question in this case, which would make his determination final and conclusive; on the contrary he concedes the authority of the judiciary over the question. And on the subject of the power of this court to entertain jurisdiction over this case, we are unanimous in our conclusion.

This brings us to the inquiries involved in the merits of this case.

2d. Is there any legal authority to form a new and additional banking company in the county of Hamilton, under the banking law of 1845 and its amendments?

By a well settled rule of construction, statutes conferring special privileges in derogation of common right, are to be strictly construed; and authority to create new corporations cannot be derived from mere implication.

The fourth section of this banking law of 1845, provides that "the number of banking companies which *shall be formed* and permitted to engage in the business of banking under the provisions of this act, in the county of Hamilton, *shall not exceed four.*" Four companies were formed, and actually engaged in the business of banking under the authority of this law. It is argued, however, that, as one of these companies has failed, and another withdrawn its capital, vacancies have been created which may be filled by the formation of new companies. It is not necessary to inquire here whether a corporation can dissolve itself, and whether the existence of these failing corporations has become extinct; or whether, where just cause of the forfeiture of the franchise has occurred, the corporation absolutely ceases to exist, until the forfeiture be ascertained and declared by a competent tribunal in a judicial proceeding instituted against it for that purpose. It is sufficient to say, that no authority is conferred by this statute to fill vacancies or supply the places of any corporations actually formed under this law, which may have gone out of existence. The authority conferred is not to have and continue in operation four companies in Hamilton county; but simply authority providing that the number of companies

specified, and no more, may *be formed* and *allowed to engage in business* in that county.   So that when the number of companies authorized in Hamilton county, were once formed and had engaged in business, the power conferred by the statute was exhausted.   And no new or additional company could be formed in that county without further legislation.   And the provisions of the eighth section of the amendatory act of 1848, have most, clearly no application to the present case.   The authority there conferred can only arise out of the matter of the distribution of the fractions of unappropriated banking capital.   With these views of the law, the relief sought by the relators must be denied.

Upon the other ground, taken in the defense, whether the authority to form new and additional corporations under the banking law of 1845, ceased by the operation of the new constitution, in September, 1851, I do not entertain a doubt, and have no hesitation in expressing an opinion.

After the new constitution took effect, no new or additional corporations could be formed and put into operation, at variance with the terms and conditions prescribed in the constitution. The thirteenth article of the constitution not only provides limitations on the legislative power in reference to corporations ; but also prescribes the terms and conditions on which corporations might thereafter be formed.   The following provisions have express and direct reference to *the act of forming* corporations, and the conditions on which they might be *instituted,* as distinguished from the provisions having exclusive reference to the legislative power of *authorizing* corporations to be formed ; to wit :

The second section of this article of the constitution provides that " corporations may be formed under general laws," subject to alteration or repeal.

The third section provides that dues from corporations shall be secured by certain individual liability of the stockholders, etc., prescribed by law ; and

The fourth section provides that the property of corporations " *shall forever be subject to taxation, the same as the property of individuals.*"

The first and seventh sections of this article of the constitution have reference to the exercise of the legislative power, but these provisions of the second, third and fourth sections have direct reference to, and operate directly on, the corporate existence of the artificial person itself. After the constitution took effect, therefore, no new or additional corporation could be formed in this State, at variance with either of these provisions; consequently the authority to form additional banking corporations under the law of 1845, fell by the operation of the constitution.

Upon this question, I have expressed my views more fully in my dissenting opinion in the case of the *Citizens' Bank of Steubenville* v. *Wright, Auditor of State*, reported in 6 vol. Ohio St. Rep. 331.

The case of *Cass* v. *Dillon*, 2 Ohio St. Rep. 608, has been referred to as authority to sustain the position of the relators in this case. That case, however, has, as I conceive, no application whatsoever to the case before us. It depended on the effect of an entirely different provision of the constitution, to wit, the sixth section of the eighth article, which is a simple limitation on the future exercise of the legislative power, in express and direct words. It is but just to say, in reference to that case, that although I concurred in the decision of the case, I did not then, and do not now, concur in the accuracy of all the reasoning of the learned judge who announced the decision of the case.

*Motion for the allowance of a writ of mandamus overruled.*

Judges SCOTT and BOWEN dissented as to the construction given to the banking law of 1845, and BOWEN, J., also as to the effect of the amendatory law of 1848.