THE PEOPLE ex rel. NICHOLS v. THE MAYOR.  441

First Department, December Term, 1879.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. SIDNEY P. NICHOLS, Respondents, v. THE MAYOR OF THE CITY OF NEW YORK, Appellant.*

*Charter of New York — chapter 335 of 1873, section 25 — removal for cause — rights of party sought to be removed — power of court to review action of governor.*

Section 25 of chapter 335 of 1873, the charter of the city of New York, provides that " the heads of all departments  *  *  *  and all other persons, whose appointment is in this section provided for, may be removed by the mayor for cause, and after opportunity to be heard, subject, however, before such removal shall take effect, to the approval of the governor, expressed in writing."

*Held*, that before an officer could be removed thereunder he was entitled to have a definite and specific statement of the charge served upon him ; a reasonable time to appear and answer it ; the right to hear and examine the evidence by which it was attempted to be sustained ; to produce testimony to show its falsity, and to the aid and advice of counsel in the conduct of the examination.

That the cause of removal must be found in some act of omission or commission by the officer in regard to his duty or affecting his general character, which the law and a sound public opinion pronounces to be sufficient to justify a forfeiture of the office, and not in the political bias or personal dislike of the officer having the power of removal.

April 5, 1879, the mayor of the city of New York made an order purporting to remove the relator, one of the police commissioners of the said city, from his office, which removal was approved by the governor on the seventeenth of the same month.   On the hearing before the mayor, the relator was not allowed to appear by counsel, to examine the evidence upon which the charges were made, or to produce witnesses.

Upon an application for a writ of *certiorari* to the mayor of the city of New York, and the governor of the State to review their action, *held*, that the writ would issue to the mayor.

That the court had power to issue the writ to the governor, if necessary, to protect the rights of the relator.

That it was unnecessary to issue it to the governor in this case, because if the action of the mayor was reversed and held for naught, the approval of the governor would fall with it.

*Quære*, whether, as the action of the mayor and governor was separate and not joint, the action of each should not be reviewed separately, and whether it would not be irregular to issue one writ to both jointly.

---

* For the further history of this controversy see *The People ex rel. The Mayor* v. *Nichols* (18 Hun, 530), where it was ordered that a writ of prohibition issue forbidding the Special Term, held at chambers in the first district, from giving judgmen on the return, made by the mayor pursuant to an order of Hon. T. R. Westbrook directing such return to be made, which order directing such return is one of the orders above appealed from.  This order directing that the writ of prohibition issue was reversed on appeal to the Court of Appeals, January 27, 1880.  (Opinion by Danforth, J.). — [Rep.

442 THE PEOPLE ex rel. NICHOLS v. THE MAYOR.

First Department, December Term, 1879.

When the governor of a State refuses to act as the law directs, or when he acts contrary to law to another's injury, or when he makes an error or mistake in the discharge of a judicial duty, which the statute might have authorized another to perform; in any of these cases, the party aggrieved may seek, and will receive, the protection of the courts.

APPEAL from two orders, one allowing a writ of *certiorari* and the other directing a return to be made to such writ.

On the application for a *certiorari*, the following opinion was delivered at the Special Term :

WESTBROOK, J.:

On the 5th day of April, 1879, Mr. Edward Cooper, the mayor of the city of New York, made an order purporting to remove Mr. Sidney P. Nichols, one of the police commissioners of said city, from office, which act was approved by the governor of the State, Hon. Lucius Robinson, on the seventeenth day of the same month. Mr. Nichols asks that a writ of *certiorari* may issue from this court to the said mayor and governor to review their action in the premises.

The power of removal of the heads of departments in the city of New York is given by its charter (chap. 335 of Laws 1873, § 25), and is in these words : " The heads of all departments, including those retained as above, and all other persons whose appointment is in this section provided for, may be removed by the mayor for cause, and after opportunity to be heard, subject, however, before such removal shall take effect, to the approval of the governor, expressed in writing."

On the 14th day of March, 1879, according to the papers upon which this application is founded — and neither that nor any other fact stated therein is denied — the mayor caused a written notice to be served upon Mr. Nichols, which alleged that under the management of the board of police, of which said Nichols was a member, the police force had become lax in discipline and demoralized, and the cleaning of streets had been neglected ; that Mr. Nichols had been negligent in the discharge of his duties, had allowed personal dissensions to interfere therewith, and that his conduct had been unbecoming his office. To these charges Mr. Nichols was to answer at noon of Wednesday, March 19, 1879, at the mayor's office.

On the return day of the notice, Mr. Nichols appeared before the mayor, with counsel, and desired to be heard through them, which the mayor refused. Mr. Nichols, in writing, protested against the assumption of the mayor, contained in the notice served, that he was guilty of acts justifying his removal before a hearing had been had, and claimed that the charges were not specific, and that no sufficient opportunity had been given him to be heard. He further, saving all exceptions to the mayor's action, denied, generally and specifically, all charges contained in the notice.

After this paper had been read, considerable conversation occurred between the mayor and the commissioner, in which the mayor assumed to know the conditions of certain streets from observation, and in regard to which he wished to interrogate the commissioner. To all these interrogatories, Mr. Nichols answered :— " If the mayor will furnish to me specifications of the charges he holds, if any, against me, and will allow me reasonable time to reply to the same, I desire to be heard." The mayor, however, insisted on a hearing then and there, and proceeded to repeat various questions concerning the streets, to all of which Mr. Nichols gave the answer above stated. After this had continued for some time, Mr. Nichols read a paper as follows : — " I am, and have at all times, been ready and willing to give the mayor full information upon every subject connected with the police department or its operations, but it is not proper for me, in a proceeding in which I am denied the right of counsel, and have not been furnished with charges or specifications, to make answer which would seem to recognize in any way the regularity of the proceedings against me."

After the reading of this paper, a conversation of the same tenor was renewed, which finally resulted in the mayor signifying his willingness to receive any further statement from Mr. Nichols in the course of twenty-four hours, and upon this announcement the mayor said :—" The matter is closed as to Mr. Nichols." On the 3d day of April, however, the mayor enclosed a printed copy of the stenographer's notes of the interview of March 19, 1879 (from a supposed copy of which the foregoing statement is made), accompanied with a note declaring he would give Mr. Nichols a

further opportunity to be heard on April 5, 1879, and that he (the mayor) would then receive "any statement, explanation or argument in writing." The mayor further wrote :— " In the absence of further answer or explanation by you, and upon the statements of cause heretofore made by me to you, if the record shall remain unchanged, I shall transmit the same, together with a certificate of your removal from the office of police commissioner, to the governor for his approval."

To this communication Mr. Nichols answered at some length, criticising the mayor's action and asking, if he appeared, whether he could have specifications of the charges against him ? Whether witnesses against him would be produced ? Whether he would be permitted to refute, by testimony, the charges made against him ? And whether he would be allowed counsel upon the hearing ?

To this the mayor made no reply, and on the 5th of April, as already stated, issued and sent to the governor a certificate that he had removed said Nichols for the following causes :

" *First.*— That under the board of police, of which the said Sidney P. Nichols is a member, the government and discipline of the police force have become lax and incapable, the police force has deteriorated in efficiency and it has become demoralized, and that no satisfactory explanation thereof, or satisfactory excuse therefor, has been made by the said Sidney P. Nichols exonerating either himself or said board from responsibility and blame.

" *Second.*— That the board of police, of which the said Sidney P. Nichols is a member as aforesaid, has not caused the streets of the city to be thoroughly cleaned, and has not removed from the city daily, and as often as necessary, all ashes, dirt, rubbish and garbage, and that no satisfactory explanation thereof, or satisfactory excuse therefor, has been made by the said Sidney P. Nichols, exonerating either himself, as a member of said board, or said board from responsibility and blame.

" *Third.*— That the said Sidney P. Nichols, as such commissioner of police, had been negligent in his discharge of the public duties which he was bound to perform."

On the 7th of April, 1879, the governor notified Mr. Nichols that he would be heard on the ninth of the same month on the

subject of the removal.   On that day Mr. Nichols appeared at the executive chamber in Albany, and protested against the proceedings, but, nevertheless, the action of the mayor was approved by the governor on the 17th of April; but on what evidence, if any, the action of the governor was based does not appear.

This full history of the proceedings up to the time of the present application, which was on due notice to the mayor, governor and the person appointed to fill Mr. Nichols' place in the police board, Mr. Charles F. MacLean, has been related to show that the mayor, in the initiation of the proceedings for Mr. Nichols' removal, assumed that the charges were well founded; that on a notice of five days, without the aid of counsel and without the presence of witnesses, Mr. Nichols was required to establish his innocence of charges, of the particulars of which he was uninformed, to a magistrate who had prejudged his case, and that the order of removal was made either upon the assumed accurate knowledge of the mayor, or upon evidence taken in the absence of the accused, of the character of which he was uninformed, and to rebut which, by reason of its careful concealment, was simply impossible.

The question which this motion presents is : — Ought the writ of *certiorari*, which, if allowed, enables the courts to decide what power, if any, they possess in the premises, and whether the removal was legal or otherwise, to issue?  Its simple allowance decides nothing, except that the questions involved are so grave that they deserve settlement by the tribunal of ultimate resort. Wide differences of opinion do exist, even in professional minds, as to the jurisdiction of the courts in cases of this character, and as to the mode and manner in which the power of removal vested in the mayor of the city of New York and the governor of the State, by the provisions of the charter hereinbefore given, should be exercised ; and as the present application presents all fully, it would seem to be wise to so dispose of it, that all doubts should be solved, and the course of procedure in future similar cases be so well defined that proceedings which must, in the interest of the good government of the great metropolis, be sometimes taken, should not fail by reason of non-compliance with the terms of the statute.   As, however, various points were discussed upon the hearing, it is proper that my own views on some of them should be presented.

The provision of the charter of the city of New York (§ 25 of chap. 335 of Laws of 1873) above quoted, it will be remembered, authorizes the removal of the head of a department thereof "for cause" only. The meaning of those words, "for cause" in the connection in which they occur, is too obvious to require extended comment. If it had been intended that the power of removal should exist in the mere discretion of the officers to whom it was confided, it would have been accomplished by the conferring thereof generally, without the addition of any words of restriction. That the words, the signification of which we are discussing, were added as a limitation upon the power lodged with the mayor, shows that the "cause" of removal should be found in some act of omission or commission by the officer in regard to his duties, or affecting his general character, which the law and a sound public opinion will pronounce to be sufficient to justify a forfeiture of the office, and not in the political bias or personal dislike of the city's executive chief, nor in his leanings toward another individual for whom the place is desired.

This view of the charter of New York, and of the same words when occurring, as they do in other legislative and constitutional enactments, is not novel, but, on the contrary, has oftentimes been expressed by eminent statesmen and jurists. On the 17th day of February, 1875 (see "The City Record" of February 24, 1875), the Hon. Samuel J. Tilden, then the governor of this State, wrote to Mr. Wickham, then mayor of the city of New York, in regard to the attempted removal of the corporation counsel, as follows :

"Removals for cause are distinguishable from removals which are in the arbitrary will of the officer vested with the power, and which have generally followed the changes of the removing power or of party ascendancy. * * * The principle on which the whole system rests is, that a removal in such cases must be for a substantial, reasonable and just cause. The nature of that cause it is not now necessary to discuss. * * * The power, therefore, exists to give legal effect to a removal without obeying the rule which is binding on the conscience of the functionary making it. But a disregard of that rule would be none the less a violation of right and duty. It would be the immoral power to do wrong,

because the law had not disabled the officer having the discretion. In the case of the governor, such a violation, if committed in evident bad faith or by a gross abuse implying bad faith, would, doubtless, render him liable to removal by impeachment. In the case of the mayor, it would expose him to removal in the manner provided by the statute."

It is proper to state that Governor Tilden, in the letter from which the foregoing quotation has been made, assumes that the action of the mayor and governor, in a case like this, is not reviewable by the courts, the soundness of which assumption will be hereafter considered ; but, as a whole, it is eminently worthy of perusal for its clear definition of a removal " for cause," and for its cogent exposition of the danger and wickedness of executive action, which converts a power limited by such a phrase into one resting upon arbitrary will.

The point we are discussing, however, has been judicially settled in this State in *People ex rel. Munday* v. *Fire Commissioners* (72 N. Y., 445). The relator had been removed from the office of clerk in the fire department of the city of New York. Section 28 of the aforesaid chapter 335 of the Laws of 1873, provides for the appointment and removal by heads of departments of " all chiefs of bureaus (except the chamberlain), as also all clerks, officers, employees and subordinates in their respective departments," and declares : " But no regular clerk or head of a bureau shall be removed until he has been informed of *the cause* of the proposed removal and has been allowed an opportunity of making an explanation." The General Term of this court for the first department, on *certiorari*, reversed the action of the board of fire commissioners in removing Munday from office, and the Court of Appeals sustained such reversal. Judge ALLEN, who delivered the opinion of the latter tribunal (page 449), said : " The removal must be ' for cause,' and the process for removal is prescribed by statute and must be pursued. The party against whom the proceeding is taken must be informed of the cause of the supposed removal, and be allowed an opportunity of explanation. This necessarily implies that the ' *cause* ' is to be some dereliction or general neglect of duty, or incapacity to perform the duties, or some delinquency affecting his general character and his fitness for

448 THE PEOPLE ex rel. NICHOLS v. THE MAYOR.

FIRST DEPARTMENT, DECEMBER TERM, 1879.

the office. The cause assigned should be personal to himself, and implying an unfitness for the place, and such cause being assigned, if unexplained, the removal may be made. An explanation may consist either of excusing any delinquency, or apparent neglect or incapacity—that is, explaining the unfavorable appearances, or disproving the charges; that some other man is a better man than the accused, or more congenial to the appointing or removing power, is not a cause which the incumbent can explain in the sense in which that term is used, and is no cause for removal within the statute. That something substantial is intended by the statute is more evident from the fact that the 'true grounds' of the removal are to be entered upon the records, and 'a statement showing the reason therefor' filed in the department."

The case before us is even plainer. Judge ALLEN, in defining what "cause" for removal meant, in the section of the statute upon which that proceeding reviewed by him was taken, was compelled to construe it as if the power of removal was expressly stated to be "for cause" only. By section 25, however, on which the action against Mr. Nichols was taken, the only authority conferred upon the mayor is "for cause;" and if arguments in favor of his (Judge ALLEN'S) interpretation of the words used in section 28 can be drawn from the fact that that section required a statement of the reasons for the removal to be filed in the department, the same are applicable to the case before us, for section 25 also declares, "whenever a removal is so effected, the mayor shall, upon the demand of the officer removed, make in writing a public statement of the reasons therefor."

It can hardly be necessary to pursue the further discussion of the proposition, that the power to remove a person from office "for cause" means that a reason must exist which is personal to the individual sought to be removed, which the law and a sound public opinion will recognize as a good cause for his no longer occupying the place. Many cases establishing the correctness of this view can be found. If the meaning claimed is not sufficiently clear as an original proposition, sustained as it is by the opinion of an eminent statesman who once filled the chief executive chair of the State, the judgment of our court of last resort must foreclose and end all argument.

It is claimed, however, that the removal of Mr. Nichols was "for cause," within the definition given, and for that reason the order, therefore, was legal. It is a fact that the certificate sent by the mayor to the governor stated reasons which, if they be true, justified action, provided the steps which the law required to be taken in their ascertainment were followed. A criminal act will justify the punishment of its perpetrator only when conviction therefor has been had under, and through the forms which the statutes provide, and a removal from office, to be effectual, must follow the process prescribed for it. This bring us to the inquiry,—What should have been the course of procedure in the case before us? In the discussion of this question, which relates to the manner of removing one of the heads of a very important department in a great city, and not to the ordinary summary dismissal of a laborer or clerk, the peculiar phraseology of the act must not be forgotten. The removal must be *"for cause"*—i. e., for some good reason, which actually exists, and not for a false reason, which the removing power honestly, but mistakingly, believes to be true. The right to investigate is necessarily conferred upon the individual or body, who or which is authorized to act in a given direction upon the existence of certain facts, which furnish the only basis for proposed action; and when such action taken will affect the rights of another, he, who is to be so affected, must be heard upon an investigation which is to ascertain the truth of alleged facts, on which depends the power to act to his injury. Quite early in the jurisprudence of this State (*Hickock* v. *Scribner*, 3 Johns. Cas., 311–315), RADCLIFF, J., said: "I consider it a maxim of natural justice and of universal law, an axiom, not now to be proved, that no. man ought to be affected in his rights by the judgment or decree of any court without an opportunity of being previously heard in his defence." The principle thus clearly stated must also be applicable to any tribunal which has power to judicially decide a question affecting the rights of another, whether it is a court in name or not, because the reason on which it is founded applies to both; and this "opportunity to be heard," required not only by an axiom of the law, but in the proceeding against Nichols demandad by the positive words of the statute on which it was

based, involves, necessarily, a definite and specific statement of the charge, a reasonable time to answer it, the right to hear and examine the evidence by which it is attempted to be sustained, to produce testimony to show its falsity, and the aid and advice of counsel in the conduct of the examination. All this seems to be so elementary in the minds of persons living under the common law that citation of authority to sustain it is perhaps unnecessary labor. If, however, the soundness thereof is questioned, the following authorities will remove all doubt :

Judge Dillon, in his work on Municipal Corporations (second edition, § 191), in considering the manner of removing a municipal officer, says : " The proceeding in all cases, where the amotion is for cause, is adversary or judicial in its character, and if the organic law of the corporation is silent as to the mode of procedure, the substantial principles of the common law as to the proceedings affecting private rights must be observed." In section 192 he states that " the officer is entitled to a *personal notice* of the proceeding against him, and of the time when the trial body will meet ;" and in section 193 he says : " There must be a charge or charges against him, specifically stated, with substantial certainty ; yet the technical nicety required in indictments is not necessary, and *reasonable time and opportunity* must be given to answer the charges and to produce his testimony ; and he is also entitled to be heard and defended by counsel, and to cross-examine the witnesses, and to except to the proofs against him. If the charge be not denied, still it must, if not admitted, be examined and proved. Where the specific charge stated is insufficient to justify the removal, or where the removal is erroneous and no good, and sufficient ground thereof appears, the officer is entitled to a *mandamus to restore him.*"

The author cites many adjudged cases, both in England and in this country, in support of his positions, which are not referred to in this opinion. They will be found to fully justify his conclusions. There is a single case, however (*Murdock v. The Trustees of Phillips' Academy*), which was twice before the Supreme Court of Massachusetts (7 Pick., 303; 12 id., 244), worthy of special attention.

Dr. Murdock had been removed from the position of profes-

sor in the seminary by the trustees. The charter gave the right to remove for "gross neglect of duty, scandalous immorality, mental incapacity or any other just and sufficient cause." In the opinion reported in 7 Pick., Parker, Ch. J., in discussing the sufficiency of charges (p. 330), says: "Secondly, it is alleged that the articles of charge are not sufficiently definite and particular, and this would be a material objection, if sustained by the record; for we hold that by analogy to trials on criminal accusations in courts of justice, and the principles of the constitution, no man can be deprived of his office, which is a valuable property, without having the offence with which he is charged 'fully and plainly, substantially and formally described to him.' This enters so essentially into the justice of the case, and into the character of a fair trial, that it ought never to be dispensed with. Without it, the party charged does not know what to defend against, nor can another body, to which there may be an appeal, ascertain the applicability or the effect of the evidence." In 12 Pick., the court, per Shaw, Ch. J., describes the course of procedure to be observed by a body empowered to remove a person from office (p. 263): "1. A monition or citation of the party to appear.. 2. A charge given him, which he is to answer, called a libel. 3. A competent time assigned for the proofs and answers. 4. A liberty for counsel to defend his cause and to except against the proofs and witnesses. 5. A solemn sentence after hearing all the proofs and answers." The learned chief justice quotes these rules from 2 Burnes Ecc. Law, 145, and then adds: "It is not to be insisted on, that in exercising the powers vested in a new jurisdiction, where no forms are prescribed, any precise course as to forms must be followed, but these rules indicate the course which must, in substance, be pursued by every tribunal acting judicially upon the rights of others."

In *People ex rel. Munday* v. *Fire Commissioners* (72 N. Y., 445), referred to above, it will be remembered (see p. 449), Judge Allen said: "The party against whom the proceeding is taken must be informed of the cause of the supposed removal, and be allowed an opportunity of explanation. * * * An explanation may consist either of excusing any delinquency or apparent neglect or incapacity — that is, explaining the unfavorable appearances or disproving the charges."

In *The People ex rel. Garling* v. *Van Allen et al.* (55 N. Y., 31), the Court of Appeals expressly adjudicates one question which this application presents — the right to be heard by counsel. The case brought up for review the proceedings of a court martial, before which tribunal that privilege had been denied. The judgment of the military tribunal was reversed, and it was held that section 189 of the " General Regulations " which forbade the appearance of counsel *eo nomine* was unconstitutional and void, because section 5 of article 1 of our State constitution provides for the presence of counsel for the accused " in any court whatever." It needs no argument to prove that any proceeding initiated to remove a person from public office before a person or body having jurisdiction to decide upon the existence of " cause " for removal, is judicial in its character, and the tribunal to which it is presented is a court for that particular purpose, and that therefore the constitutional provision is applicable. In the face of that constitutional enactment, and of the decision of the court of last resort, the order of the mayor to the policemen to remove counsel from the room, in which they were lawfully present to guard their client's rights, was, at least, singular and extraordinary.

If the conduct of the mayor in the removal of Mr. Nichols be tested by the well-established course of procedure to be observed in cases of that character, it is very clear that it cannot be upheld. There was no specific statement of charges ; the aid of counsel was denied ; the proofs against the accused were not taken in his presence, nor was he informed of the nature thereof ; no opportunity to produce witnesses was afforded, and, in short. not a single right secured by the law, except to appear and prove his innocence of general charges, was accorded. It is possible that the mayor acted upon what he supposed was personal knowledge ; and if he had any, perhaps, as he was the city's official executive head, it might be taken by him as evidence ; but it is most obvious that he might have been mistaken, and it was the clear right of the accused to an explicit statement by the mayor of that supposed knowledge, to the end that, if he was in error, previously formed opinions might be corrected and removed by proof.

This brings us to the consideration of the last question presented — can this court review the action taken ?

As to the right to issue the writ to the mayor, there can be no doubt. It has been so often decided that it is no longer an open question. The following cases, and many others to be found, are directly in point: (*The People ex rel. Bancroft* v. *Weigant*, 14 Hun, 546; *The People* v. *The Board of Police*, 39 N. Y., 506; *The People ex rel. Folk* v. *The Board of Police and Excise of the City of Brooklyn*, 69 id., 408; *The People ex rel. Clapp* v. *Board of Police of the City of New York*, 72 id., 415; *The People ex rel. Munday* v. *The Board of Fire Commissioners of the City of New York*, 72 id., 445.) As to the governor, the question is not free from difficulty, for there are cases, and notably that of *Southerland* v. *The Governor* (29 Mich., 320), which hold that the action of the chief executive of a State cannot be reviewed nor questioned by the courts. The argument against the power of the courts, to state it in the language of the attorney general's brief, submitted on this motion, is: " The powers of the State government are, by the constitution, divided into three co-ordinate departments — legislative, judicial and executive — each independent of the other, except in so far as subordinated by the constitution," and, therefore, the conclusion follows that the one cannot question or review the action of the other. Undoubtedly, this proposition is, in a general sense, sound, and yet sometimes it is not true. The courts must, when their power is invoked, declare what the law is, and enforce and protect public and private rights under it. They have not, it is true, the power to prescribe and define executive action in matters of public policy or political expediency, or matters vested in simple executive discretion, nor to dictate to the Legislature the course of legislation, but they can, and frequently do, interfere with executive action, which, contrary to the law, as they expound it, wrongfully interferes with the persons or rights of individuals, and they can and do frequently declare legislation, though it has been enacted in the manner prescribed by the constitution, to be contrary to the fundamental law and void. It is, as has already been said, the constitutional prerogative of the judicial department of the government to declare what the law is, whenever a question under it is properly submitted, and at the instance of the public or of private parties to enforce all its remedies and

454 THE PEOPLE ex-rel. NICHOLS *v.* THE MAYOR.

FIRST DEPARTMENT, DECEMBER TERM, 1879.

afford all its protection. In a republican form of government there can be no officer or person beyond the jurisdiction of the courts, for there is none above the law. Will it be seriously argued that if the governor of the State seizes an individual and detains him, that the courts have no power to inquire into the detention, and, if illegal, release him ? If the governor, contrary to law, though professing to act in conformity therewith, by virtue of his office, takes a man's property, are the courts impotent to afford relief ? If the governor unlawfully prevents a person from discharging the duties of an office of which he is the rightful incumbent, are the doors of the courts barred to him when, as a suitor for justice, the party interfered with seeks relief ? And when the governor is clothed with judicial functions to decide a question, which any other person could as well have been authorized to determine as he, is his action incapable of review while that of any other officer or individual is reviewable ? These questions can have but one answer, unless the chief executive is above and beyond the law, which no one will contend. The jurisdiction of courts cannot be controlled or limited by the official position of any one. When they issue a mandate commanding an act, they do so not because the person commanded is their legal inferior, but because the law is the superior of all, and its commandments must be obeyed, and when they restrain action, it is because the law restrains. There can be no clashing between the executive and judicial departments of government when to the former is committed all discretionary governmental, political and executive action, and to the latter the interpretation of law and the administration of justice under it. The checks and balances of government are better preserved by conceding to each department thereof its appropriate sphere of action, than by limiting the general jurisdiction of the one by the official grade of the individual filling another. These general principles are well sustained by adjudged cases.

In *Commonwealth* v. *Fowler* (10 Mass., 290), the appointment of Fowler by the governor to the office of probate judge of Hampden county was questioned by *quo warranto*. In answer to the point distinctly made, that the action of the executive was above question, the court (p. 301) said : " The other objection is that an information, of the nature of that before us in this case, does not lie

THE PEOPLE ex rel. NICHOLS v. THE MAYOR. 455

First Department, December Term, 1879.

against an officer appointed by the supreme executive authority of the commonwealth. And it is said that, as the executive have the exclusive right of appointing, so it must have exclusively the right to determine when a vacancy in office exists, the filling of which appertains to that branch of the government, the executive being a branch of the sovereignty of the commonwealth equally independent with the judiciary. Our government is founded on principles not known to the laws of any other country. The sovereignty of the commonwealth remains in the people. The several departments of the government—the legislative, the executive and the judicial—are the agents of the people in their respective spheres. When the Legislature enact a law not authorized by the constitution, it is the part and the duty of the judiciary to declare it void. When the executive, in an act or appointment, overleaps the bounds prescribed to it by the constitution and the laws it is alike the part and the duty of the judiciary to pronounce such act or appointment null and void."

To precisely the same effect are the following cases, each presenting the identical question decided in the Massachusetts case : *Morton* v. *The Mayor* (N. Y. Daily Reg., Nov. 15, 1878); *Hogan* v. *Carberry* (4 Cin. Law Bulletin, No. 7, Mar., 1879 [ in this last case the governor had removed an officer and appointed another ; the court held his action void]); *Page* v. *Hardin* (8 B. Monroe L. & Eq. Rep., 648.)

The famous case of *Marbury* v. *Madison* (1 Cranch, 137), fully sustains the positions taken in this opinion. Chief Justice Marshall concedes that " by the constitution of the United States,, the president is invested with certain important political powers,, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience." Certain officers, too, appointed by the president, the learned judge declares, when they act by his orders, " in cases in which the executive possesses a constitutional or legal discretion," are beyond the control of courts. " But," he adds, " where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy." And again the

learned judge says : " What is there in the exalted station of the officer which shall bar a citizen from asserting in a court of justice his legal rights, or shall forbid a court to listen to the claim ; or to issue a mandamus, directing the performance of a duty, not depending on executive discretion, but on particular acts of Congress and the general principles of law ? It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus is to be determined."

In *State of Ohio ex rel. Whiteman et al.* v. *Salmon P. Chase, Governor, etc.* (5 Ohio St. Rep., 528), one question involved was the power of the court to issue a mandamus to the governor. Upon that question the court, per BARTLEY, Ch. J., said : " Can the chief executive officer of the State be directed or controlled in his official action by proceedings in mandamus ? It is claimed, on the part of the defence, that inasmuch as the government is, by the constitution, divided into the three separate and co-ordinate departments — the legislative, the executive and the judicial — and inasmuch as each department has the right to judge of the constitution and laws for itself, and each officer is responsible for an abuse or usurpation in the mode pointed out by the constitution, it necessarily follows that each department must be supreme within the scope of its powers, and neither subject to the control of the other for the *manner* in which it performs, nor its *failure* to perform, either its legal or constitutional duties. This argument is founded on theory rather than reality. That each of these co-ordinate departments has duties to perform in which it is not subject to the controlling or directing authority of either of the others must be conceded. But this independence arises not from the grade of the officer performing the duties, but the nature of the authority exercised. Under our system of government, no officer is placed above the restraining authority of the law, which is truly said to be universal in its behests, ' all paying it homage, the least as feeling its care and the greatest as not exempt from its powers ; ' and it is only where the law has authorized it that the restraining power of one of these co-ordinate departments can be brought to operate as a check upon one of the others. * * While the authority of the governor is *supreme* in the exercise

THE PEOPLE ex rel. NICHOLS v. THE MAYOR.  457

First Department, December Term, 1879.

of his political and executive functions, which depend on the exercise of his own judgment or discretion, the authority of the judiciary of the State is *supreme* in the determination of all legal questions involved in any matter judicially brought before it. Although the State cannot be sued, there is nothing in the nature of the office of governor which prevents the prosecution of a suit against the person engaged in the discharge of its duties. This is fully sustained by the analogy of the doctrine of the Supreme Court of the United States in the case of *Marbury* v. *Madison* (1 Cranch, 170)."

The question of the power of the courts to interfere with and annul the action of the chief executive of the State, when such action affected private rights, was, by our own Court of Appeals, settled in favor of its existence in *People ex rel. Lawrence* v. *Brady* (56 N. Y., 183). Lawrence had been arrested by order of the governor of this State, to be extradited to the State of Michigan, on the requisition of its governor, and had been refused a discharge on *habeas corpus* in the lower courts. The Court of Appeals, however, reversed the prior decisions and discharged the prisoner, holding that the evidence upon which the governor issued his warrant of extradition was insufficient.

*In the Matter of Briscoe* (51 How., Pr. 422), the writer of the present opinion discussed the same question (pp. 428, 429, 430), and reached the same conclusion. That opinion is, however, only referred to for the purpose of showing that the views herein expressed, as to the authority of the courts to interfere with executive action, are not new to him, but have been long since deliberately adopted and formally expressed. They are also sustained *In the Matter of Manchester* (5 Cal., 237); in *Hartman* v. *Aveline* (13 West. Jur. [Sup. Ct. of Ind.], 208); and in *Wilcox* v. *Nolze* (13 West. Jur. [Sup. Ct. of Ohio], 209).

Upon reason and principle, then, it is held that when the governor of a State refuses to act as the law directs, or when he acts contrary to law to another's injury, or when he makes an error or mistake in the discharge of a judicial duty, which the statute might have authorized another to perform, in any of these cases the party aggrieved may seek the protection of the courts, who, in listening to the complaint and in redressing the grievance, if any

exists, usurp no executive functions, but simply assert and exercise their own.

It is assumed that the action which the governor of this State was called upon to take, when the mayor transmitted to him the certificate of removal of Nichols, was judicial in its character. It is true he is an executive officer, but that fact does not make every duty imposed upon him one of an executive nature. He was called upon to judge and decide whether the reasons which the mayor gave for the removal were sufficient, and not only that, but he was bound (see letter of Governor Tilden, referred to above) "to take all information necessary to enable him to decide whether he ought to give or withhold his approval of an act of removal initiated by the mayor, under the law which defines their respective powers and obligations in such cases." In short, he was to determine for himself whether there was "cause" for the removal; or, to use the language of Judge Aʟʟᴇɴ, in *People* v. *Fire Commissioners* (72 N. Y., 449), "some dereliction or general neglect of duty, or incapacity to perform the duties, or some delinquency affecting his general character and his fitness for the office." To argue that the investigations of such questions and their determination is not the exercise of judicial power would be a frivolous discussion.

A careful examination of the questions which this application involves has led to the conclusion that the court has the power to review the action of both the mayor and the governor, and that, to use no stronger language, the facts require its exercise. Whilst, however, holding that the action of the chief executive of this State is, in a case like the present, reviewable by the courts, still respect for the high office should induce judicial tribunals to be sparing in the use of their reviewing power, when process is asked to issue to or against him directly, and they should not, therefore, grant a writ of *certiorari* directed to him, unless there is no other remedy. In the present case, all the rights of Mr. Nichols can be guarded by a review of the action of the mayor. If that be reversed and held for naught, the approval of the governor falls with it, for the conclusion of both the mayor and governor must stand to make effectual the removal. Besides, their action is separate and not joint. Each makes a separate and independent decision, and, in my judgment, each should be separately reviewed.

The writ asked for will be issued to the mayor and is refused as to the governor, not because his action is beyond review, but because it is unnecessary, and also because one issuing to both jointly might be held irregular.

*W. C. Whitney* and *F. N. Bangs*, for the appellant.

*Townsend & Weed*, for the respondent.

*Per Curiam :*

We are of opinion that a writ of *certiorari* may properly be sued out to review the action of the mayor in cases of this character. The allowance of such a writ rests in the sound discretion of the court to which application is made, and this court will not interfere with the exercise of such discretion in allowing the writ, where it does not appear that it has been palpably abused.

Without considering or in any way passing upon the merits of the case which, we think, are not properly before us for that purpose, we dispose of the case upon the ground simply, that a writ of *certiorari* would lie in such a case as this, and that the action of the court in granting the same was not an abuse of its discretion.

In respect to the order directing the return to be made, it is sufficient to say that a return was made and filed, and that by the writ of prohibition heretofore granted in the case, the trial of the merits of the proceeding was sent to the proper tribunal. It becomes quite unimportant to determine whether or not the judge should, under the circumstances, have directed a return to be made, and we think that a proper disposition of the case is made by dismissing the appeal from the order.

The motion to dismiss the appeal from the order allowing the writ should be denied, and the order should be affirmed.

No costs of appeal or of the motions to either party.

Present — Davis, P. J., Brady and Ingalls, JJ.

Motion to dismiss appeal from order allowing writ of *certiorari* denied and order affirmed.

Appeal from order directing return to be made dismissed. No costs of appeal or of motion to either party.